Williams-N v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-89-225-CR

Â Â Â Â Â Â Â Â NOKOMIS WILLIAMS,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellant
Â Â Â Â Â Â Â Â v.

Â Â Â Â Â Â Â Â THE STATE OF TEXAS,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellee
 

 From the 13th District Court
Navarro County, Texas
Trial Court # 23,353
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
O P I N I O N
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â Â Â Â Â Â Â Â Â Â A jury convicted Nokomis Williams of capital murder.


 He was sentenced to life in prison
when the jury failed to affirmatively answer the questions that would have resulted in a death
sentence.



Â Â Â Â Â Â Â Â Â Â His sole complaint is that during the punishment hearing the court improperly admitted two
exhibits reflecting prior convictions without proof that he is the same person mentioned in the
exhibits. We affirm.
Â Â Â Â Â Â Â Â Â Â Assuming the exhibits were erroneously admitted, we hold that the error was harmless
beyond a reasonable doubt.


 The error could not have contributed to Williams' conviction, which
had already been determined before the exhibits were admitted. Moreover, his punishment was
automatically set at life when the jury failed to answer the questions in a way that would have
automatically resulted in the death sentence.


 Considering that he could receive no lesser sentence
than life, the error in admitting the exhibits could not have contributed to his punishment. His
point is overruled. Affirmed.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â BOB L. THOMAS
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Chief Justice

Before Chief Justice Thomas,
Â Â Â Â Â Â Â Â Â Â Justice Cummings and Justice Vance
Affirmed
Opinion delivered and filed March 18, 1992
Do not publish

Â Â Â Â Â Â Â Â Â Â Â 



 overrules the motion.

   Justices Vance and Reyna would not
join this opinion that, to me, seems warranted by the importance of the
substantive issue raised by Densey.Â  I have, therefore, provided it as my
concurring opinion to the opinion on rehearing.Â  Although I would not
ordinarily undertake so lengthy an analysis, I offer it to point out some
matters important to the analysis of a Batson issue on appeal, and as an
example of the type of analysis defense counsel should provide to assist the
Court in evaluating a Batson issue on appeal.

Â Â Â Â Â Â Â Â Â  In DenseyÂs second issue in his
original brief, filed September 9, 2004, he contended that Âthe trial court committed reversible error
when it denied AppellantÂs Batson motion as the State violated the equal
protection clauses of the United States and Texas Constitutions.ÂÂ 
(Densey Br. at 17); see U.S. Const.
amend. XIV, Â§Â 1; Batson v. Kentucky, 476 U.S. 79 (1986); Tex. Const. art. I, Â§Â 3.Â 
On June 13, 2005, the United States Supreme Court decided Miller-El v.
Dretke, in which that Court found a deprivation of equal protection and
granted habeas relief on Miller-ElÂs Batson claim.[1]Â  Miller-El v. Dretke, 545 U.S. ___, 125 S.Â Ct. 2317 (2005).Â  On
July 1, 2005, Densey filed his Supplemental Memorandum Related to Point of
Error Number Two, in which he cited Miller-El.Â  (Supp. Memo.)Â  In its
Memorandum Opinion of July 6, 2005, this Court overruled DenseyÂs second
issue.Â  Densey v. State, No. 10-04-00049-CR, slip op. at 2-3, 2005 Tex.
App. LEXIS 5239, at *2-*3 (Tex. App.ÂWaco July 6, 2005, no pet. h.) (not
designated for publication) (op. on orig. submission) (mem. op.).Â  

Â Â Â Â Â Â Â Â Â  In DenseyÂs Motion for Rehearing, he
raises one ground: ÂThe Memorandum Opinion does not address the effect, if any,
of the Miller-El v. Dretke, 125 U.S. [sic] 2317 (2005) decision by the
Supreme Court of the United States on AppellantÂs Batson challenge.ÂÂ 
(Mot. RehÂg at 1.)Â  This Court should now do so expressly.

Â Â Â Â Â Â Â Â Â  Densey raises two arguments under his
ground for rehearing.Â  First, Densey contends, ÂThe Memorandum Opinion does
not address the clearly erroneous standard in light of the Supreme CourtÂs
decision in Miller-El.ÂÂ  (Mot. RehÂg at 5 (emphasis in orig.).)Â  Although
Densey makes this argument second, I understand it to be his primary argument,
and consider it first.Â  Densey also contends that there is a Â[f]actual
distinction between the evidentiary record in this case and Gibson vs. State,
144 S.W.3d 530 (Tex.Crim.App. 2004).ÂÂ  (Id. at 3 (emphasis in
orig.).)Â  I address these arguments in turn.

Â Â Â Â Â Â Â Â Â  Under DenseyÂs first contention, as to
the standard of review, he argues, ÂThe appellate standard on federal habeas
review as articulated in Miller-El is more stringent, if not
identical to the Âclearly erroneousÂ standard articulated by the Texas Court of
Criminal Appeals in Gibson.ÂÂ  (Mot. RehÂg at 6 [(quoting Gibson,
144 S.W.3d at e.g. 534)]).Â  In the Memorandum Opinion on original
submission, this Court had cited Gibson v. Texas for the proposition
that the standard of review on appeal of rulings on Batson challenges is
Âclear[] error.ÂÂ  See Densey, slip op. at 3, 2005 Tex. App. LEXIS 5239,
at *3 (op. on orig. submission) (citing Gibson at 533-34).Â  Densey
argues:

Â Â  Miller-El was decided after Gibson.Â 
Miller-El was decided under standards of review related to
federal habeas relief.Â  The United States Supreme Court observed the following
related to the appellate standard in that case:

Â 

Under
the Antiterrorism and Effective Death Penalty Act of 1996, Miller-El may obtain
relief only by showing the Texas conclusion to be Âan unreasonable
determination of the facts in light of the evidence presented in the State
court proceeding.ÂÂ  28 U.S.C. Â§Â 2254(d)(2).Â  Thus we presume the Texas courtÂs factual findings to be sound unless Miller-El rebuts the Âpresumption of
correctness by clear and convincing evidence.ÂÂ  Â§2254(e)(1).

(Mot. RehÂg at 5 (quoting [Miller-El,]
125 S.Â Ct. at 2325 (quoting 28 U.S.C. Â§Â 2254 (2000)) (alterations by
Dempsey)).)

Â Â Â Â Â Â Â Â Â  The Âclearly-erroneousÂ standard is
the correct standard on direct appeal.Â  Several cases have recognized that Miller-El
implicates only the review of federal habeas-corpus cases, and did not alter
the standard of review for cases on direct appeal.

Â  Â Â Â Â Â Â Â  Miller-El is a federal habeas
case.Â  Miller-El, 125 S.Â Ct. at 2323.Â  Under the federal
Antiterrorism and Effective Death Penalty Act, Miller-El could obtain relief
only by showing that the state trial courtÂs adjudication was Âan unreasonable
determination of the facts in light of the evidence presented in the State
court proceeding.ÂÂ  28 U.S.C. Â§Â 2254(d)(2); see Miller-El at 2325.Â 
On habeas review, Âa determination of a factual issue made by a State court
shall be presumed to be correct.ÂÂ  28 U.S.C. Â§Â 2254(e)(1); see
Miller-El at 2325.Â  A habeas Âapplicant shall have the burden of rebutting
the presumption of correctness by clear and convincing evidence.ÂÂ  Id.

Â Â Â Â Â Â Â Â Â  The highest court of at least one
state has held that the Miller-El cases implicate only the standard of
review by habeas corpus, not by direct appeal.Â  Referring to another Minnesota case, the Minnesota Supreme Court wrote:

[The
appellantÂ]s argument seems to be that the rationale and holding in the
decision on direct appeal have been called into question by the United States
Supreme Court opinion in Miller-El v. Cockrell, 537 U.S. 322, 154 L. Ed.
2d 931, 123 S. Ct. 1029 (2003), and our decision in State v. Reiners, 664
N.W.2d 826 (Minn. 2003).Â  However, neither case alters the Batson
analysis applied on direct appeal in this case.Â  Miller-El involves
jurisdictional prerequisite for obtaining review of the denial of habeas relief
under the federal Antiterrorism and Effective Death Penalty Act of 1996 and is
inapplicable here.Â  See Miller-El, 537 U.S. at 327.Â  Cf. Patterson
v. State, 670 N.W.2d 439, 441 n.1 (Minn. 2003) (stating that Miller-El was
inapplicable to the standard of review of a postconviction petition.

Taylor v. Office of Appellate Courts, 691 N.W.2d 78, 79 n.1 (Minn. 2005).[2]

Â Â Â Â Â Â Â Â Â  Moreover, Miller-El did not
alter the standard of review of Batson challenges on direct appeal.Â  At
least one Texas case has held that ÂMiller-El reaffirms prior case law
that prohibited disparate treatment among jurors and did not announce any new
elements or criteria for determining a Batson claim.ÂÂ  Fultz v.
State, No. 03-03-00614-CR, 2005 Tex. App. LEXIS 10445, at *10 (Tex. App.ÂAustin Dec. 16, 2005, no pet. h. (extension granted)) (not designated for publication)
(mem. op.).[3]

Â Â Â Â Â Â Â Â Â  The Fifth Circuit, too, has correctly
stated that in Miller-El the Supreme ÂCourt did not announce any new
elements or criteria for determining a Batson claim.ÂÂ  Murphy v.
Dretke, 416 F.3d 427, 439 (5th Cir. 2005), cert. denied, 126 S.Â Ct. 1028 (2006).[4]Â  The Fifth Circuit notes, however:Â  

We are aware that we file this opinion less than
one month after the Supreme Court handed down its decision in Miller-El v.
Dretke, in which a six-justice majority of the Supreme Court reversed a
decision of another panel of this CourtÂwhich had affirmed both the state
courtÂs and federal district courtÂs determination that the petitioner
Miller-El should not receive relief on his Batson claim.Â  In doing so,
the Court considered the type and quantum of record evidence required to
demonstrate a Batson violation.Â  The Court did not announce any new
elements or criteria for determining a Batson claim, but rather simply
made a final factual and evidentiary determination of that particular
petitionerÂs Batson claim pursuant to the Âdemanding but not insatiableÂ
standard set forth in 28 U.S.C. Â§Â 2254(d)(2) and (e)(1).Â  Miller-El [v.
Dretke] at 2325.Â  

Murphy, 416 F.3d at 439 (some internal citations omitted)).[5]Â  

Â Â Â Â Â Â Â Â Â  Miller-El recounts the
development of the Batson standard of review in this way, in accordance
with the Supreme CourtÂs prior cases.Â  The Equal Protection Clause provides
that ÂNo State shall .Â .Â . deny to any person within its jurisdiction
the equal protection of the laws.ÂÂ  U.S. Const.
amend. XIV, Â§Â 1.Â  Â[F]or more than a century,Â the Supreme ÂCourt
consistently and repeatedly has reaffirmed that racial discrimination by the
State in jury selection offends the Equal Protection Clause.ÂÂ  Miller-El, 125
S.Â Ct. at 2324 (quoting Georgia v. McCollum, 505 U.S. 42, 44 (1992)); see Batson v. Kentucky, 476 U.S. 79, 92-93 (1986); Strauder v. West
Virginia, 100 U.S. 303 (1879).Â  ÂThe rub has been the practical difficulty
of ferreting out discrimination in selections discretionary by nature, and
choices subject to myriad legitimate influences .Â .Â .Â .ÂÂ  Miller-El
at 2324.Â  First, in Swain v. Alabama, the Supreme ÂCourt tried to
relate peremptory challenge to equal protection by presuming the legitimacy of
prosecutorsÂ strikes except in the face of a longstanding pattern of
discrimination: when Âin case after case, whatever the circumstances,Â no
blacks served on juries, then Âgiving even the widest leeway to the operation
of irrational but trial-related suspicions and antagonisms, it would appear
that the purposes of the peremptory challenge [were] being perverted.ÂÂÂ  Id. (quoting Swain v. Alabama, 380 U.S. 202, 223-24 (1965)) (alteration in Miller-El).Â 
ÂSwainÂs demand to make out a continuity of discrimination over time,
however, turned out to be difficult to the point of unworkable, and in Batson
v. Kentucky,Â the Supreme Court Ârecognized that this requirement to show
an extended pattern imposed a Âcrippling burden of proofÂ that left
prosecutorsÂ use of peremptories Âlargely immune from constitutional
scrutiny.ÂÂ Â Miller-El at 2324 (quoting Batson at 92-93).Â  ÂHence
BatsonÂs explanation that a defendant may rely on Âall relevant
circumstancesÂ to raise an inference of purposeful discrimination.ÂÂ  Id. at 2325 (quoting Batson at 96-97).Â  The term Â[a]ll relevant circumstancesÂ
includes ÂÂthe totality of the relevant factsÂ about a prosecutorÂs conduct
during the defendantÂs own trial.ÂÂ  Id. at 2324 (quoting Batson
at 94, 96).

Â Â Â Â Â Â Â Â Â  The Supreme Court
restates Batson procedure in this way, again in accordance with its
prior cases.

(1)Â Â  First, the defendant must
Âmake out a prima facie case of discriminatory jury selection by Âthe totality
of relevant facts.ÂÂÂ  Miller-El, 125 S.Â Ct. at 2325 (quoting
Batson, 476 U.S. at 94, 96)); accord Miller-El v. Cockrell, 537 U.S. at 328; Hernandez v. New York, 500 U.S. 352, 358 (1991)Â  (plurality op.).Â  

Â 

(2)Â Â  ÂÂOnce the defendant makes
a prima facie showing, the burden shifts to the State to come forward with a
neutral explanation for challenging .Â .Â . jurorsÂ within an arguably
targeted class.ÂÂ  Miller-El at 2324 (quoting Batson at 97); accord
Miller-El v. Cockrell at 328; Purkett v. Elem, 514 U.S. 765, 767-69 (1995) (per curiam); Hernandez at 358-59.Â  Then, Âthe prosecutor
must give a clear and reasonably specific explanation of his legitimate reasons
for exercising the challeng[e].Â[6]Â  Miller-El at 2324 (quoting Batson
at 98 n.20) (alteration in Miller-El); accord Miller-El v. Cockrell at
328; Purkett at 767-69; see Hernandez at 359-61.

Â 

Â (3)Â  Lastly, Â[t]he trial court
then will have the duty to determine if the defendant has established
purposeful discrimination.Â
[7]Â  Miller-El at
2325 (quoting Batson at 98); accord Miller-El v. Cockrell at
328-29; Purkett at 767-68; Hernandez at 359, 363-64.

Â 

Â Â Â Â Â Â Â Â Â  After reviewing the evidence, the Miller-El Court holds that Âwhen th[e] evidence on the issues raised is viewed
cumulatively its direction is too powerful to conclude anything but
discrimination.ÂÂ  Miller-El, 125 S.Â Ct.Â  at 2339.Â  That
Court summarizes the evidence:

In the course of
drawing a jury to try a black defendant, 10 of the 11 qualified black venire
panel members were peremptorily struck.Â  At least two of them .Â .Â .
were ostensibly acceptable to prosecutors seeking a death verdict, and [one]
was ideal.Â  The prosecutorsÂ chosen race-neutral reasons for the strikes do not
hold up and are so far at odds with the evidence that pretext is the fair
conclusion, indicating the very discrimination the explanations were meant to
deny.Â  The strikes that drew these incredible explanations occurred in a selection
process replete with evidence that the prosecutors were selecting and rejecting
potential jurors because of race.

Id.Â  That Court then concludes, ÂIt blinks reality
to deny that the State struck [panelists] Fields and Warren, included in thatÂ
ten, Âbecause they were black.Â[8]Â 
 Id. at 2340.

Â Â Â Â Â Â Â Â Â  In Miller-El, the Supreme Court
states five reasons for finding a deprivation of equal protection, as follows.Â 
Miller-El, 125 S. Ct. at 2325-40.

Â Â Â Â Â Â Â Â Â  The first reason is the Âbare
statistics.ÂÂ  Miller-El, 125 S.Â Ct. at 2325.Â  ÂOut of 20 black
members of the 108-person venire panel for Miller-ElÂs trial, only 1 served.Â 
Although 9 were excused for cause or by agreement, 10 were peremptorily struck
by the prosecution.Â  ÂThe prosecutors used their peremptory strikes to exclude
91% of the eligible African-American venire members .Â .Â .Â .ÂÂÂ  Id. (quoting Miller-El v. Cockrell, 537 U.S. at 340) (ellipsis in Miller-El
v. Dretke).Â  As Justice Kennedy put it in the Supreme CourtÂs earlier
opinion in the case, Miller-El v. Cockrell, ÂHappenstance is unlikely to
produce this disparity.ÂÂ  Id. (quoting Miller-El v. Cockrell at
340).Â  

Â Â Â Â Â Â Â Â Â  The next reason is the results of the
Âcomparative juror analysisÂ or Âside-by-side comparisons.ÂÂ  Miller-El, 125
 S.Â Ct. at 2325.Â  The Supreme Court calls this analysis Âmore powerfulÂ
than the statistics, and devotes most of the opinion to it.Â  Id.; id.
at 2325-32.Â  This comparative analysis is one of the ways in which Miller-El
might affect Texas law.

Â Â Â Â Â Â Â Â Â  ÂIf a prosecutorÂs proffered reason
for striking a black panelist applies just as well to an otherwise-similar
nonblack who is permitted to serve, that is evidence tending to prove
purposeful discrimination to be considered at BatsonÂs third step.ÂÂ  Miller-El,
125 S.Â Ct. at 2325.

Â Â Â Â Â Â Â Â Â  The Miller-El Court analyzes
two of the panelists whom the State struck in that case, Fields and Warren.

Â Â Â Â Â Â Â Â Â  As to Fields, the primary reason that
the State gave for striking him was his belief that anyone can be
rehabilitated.Â  When pressed on rehabilitation, the prosecutor added that
FieldsÂs brother had a criminal conviction.

Â Â Â Â Â Â Â Â Â  As to rehabilitation, the Supreme
Court notes Â[t]he unlikelihood that [FieldsÂ]s position on rehabilitation had
anything to do with the peremptory strike of Fields .Â .Â .Â .ÂÂ  Miller-El,
125 S.Â Ct. at 2328. Â The Supreme Court states that Âthe
credibility of reasons given can be measured by Âhow reasonable, or how
improbable, the explanations are; and by whether the proffered rationale has
some basis in accepted trial strategy.ÂÂÂ  Id. at 2329 (quoting Miller-El
v. Cockrell, 537 U.S. at 339).Â  According to that Court, Fields Âexpressed
unwavering support for the death penaltyÂ but the prosecutor struck him, while
the prosecutor Âaccepted with no evident reservationsÂ Âa number of white panel
membersÂ about whom the prosecutor Âshould have worried.ÂÂ  Miller-El at
2326, 2327.Â  

[W]hen
we look for nonblack jurors similarly situated to Fields, we find strong
similarities as well as some differences.Â  But the differences seem far from
significant, particularly when we read FieldsÂs voir dire testimony in
its entirety.Â  Upon that reading, Fields should have been an ideal juror in the
eyes of a prosecutor seeking a death sentence, and the prosecutorsÂ
explanations for the strike cannot reasonably be accepted.

Id. at
2329.

Â 

Â Â Â Â Â Â Â Â Â  The State gave as its reason for
striking Fields:

Â 

Â[W]e
.Â .Â . have concern with reference to some of his statements as to the
death penalty in that he said that he could only give death if he thought a
person could not be rehabilitated and he later made the comment that any person
could be rehabilitated if they find God or are introduced to God and the fact
that we have a concern that his religious feelings may affect his jury service
in this case.Â

Miller-El, 125 S.Â Ct. at 2327 (quoting App. at 197) [9] (alterations in Miller-El).

Â Â Â Â Â Â Â Â Â  In FieldsÂs juror questionnaire, he
stated that Âhe believed in capital punishment.ÂÂ  Miller-El, 125 S.Â Ct. at 2326.Â  In his voir-dire testimony, he testified to, as the Supreme Court
paraphrases it, Âhis belief that the State acts on GodÂs behalf when it imposes
the death penaltyÂ: ÂÂ[I]f the State exacts death, then thatÂs what it should
be.ÂÂÂ  Id. (quoting App. at 174).

Â Â Â Â Â Â Â Â Â  Yet the Supreme Court found that
Ânonblack jurors whose remarks on rehabilitation could well have signaled a
limit on their willingness to impose a death sentence were not questioned
further and drew no objection, but the prosecution expressed apprehension about
a black jurorÂs belief in the possibility of reformation
.Â .Â .Â .ÂÂ  Miller-El, 125 S.Â Ct. at 2338. Â That Court
points to the testimony of the following white panelists, id. at 2327:

Â·Â Â Â Â Â 
Hearn Âsaid that she
believed in the death penalty Âif a criminal cannot be rehabilitated and
continues to commit the same type of crime.ÂÂÂ  Id. (quoting App. at
429).Â  Hearn

went
so far as to express doubt that at the penalty phase of a capital case she
could conclude that a convicted murderer Âwould probably commit some criminal
acts of violence in the future.ÂÂ  ÂPeople change,Â she said, making it hard to
assess the risk of someoneÂs future dangerousness.Â  Â[T]he evidence would have
to be awful strong.ÂÂ  

Id. (quoting App. at 440) (internal citations
omitted) (alteration in Miller-El). 

Â ÂBut
the prosecution did not respond to Hearn the way it did to Fields, and without
delving into her views about rehabilitation with any further question, it
raised no objection to her serving on the jury.ÂÂ  Miller-El at 2327.

Â·Â Â Â Â Â 
Witt Âsaid she would take
the possibility of rehabilitation into account in deciding at the penalty phase
of the trial about a defendantÂs probability of future dangerousness.ÂÂ  Id.Â  Â[T]he prosecutors asked her no further questions about her views on
reformation, and they accepted her as a juror.ÂÂ  Id. at 2327-28.

Â Â Â Â Â Â Â Â Â  The Supreme Court also points to the
testimony of one ÂLatino veniremanÂ who served on the jury, Miller-El, 125
 S.Â Ct. at 2328:

Â·Â Â Â Â 
Gutierrez Âwould consider
the death penalty for someone who could not be rehabilitated.ÂÂ  Id.Â  Â[T]he prosecutors did not question him further about this view.ÂÂ  Id.

Â Â Â Â Â Â Â Â Â  The Supreme Court acknowledges, Âat
one point in the questioning, Fields indicated that the possibility of
rehabilitation might be relevant to the likelihood that a defendant would
commit future acts of violence.ÂÂ  Miller-El, 125 S.Â Ct. at 2326.Â 
Fields testified, ÂIf for some reason the testimony didnÂt warrant death, then
life imprisonment would give an individual an opportunity to rehabilitate.ÂÂ  Id. (quoting App. at 185).Â  

Â Â Â Â Â Â Â Â Â  In this regard, the Supreme Court
accuses the prosecutor of misstating the record.Â  That Court states, ÂPerhaps
[the prosecutor] misunderstood, but unless he had an ulterior reason for
keeping Fields off the jury we think he would have proceeded differently.ÂÂ  Miller-El,
125 S.Â Ct. at 2327.

Â Â Â Â Â Â Â Â Â  The other reason the State gave for
striking Fields was FieldsÂs brotherÂs criminal history.Â  The Supreme Court
concludes that, that explanation Âreeks of afterthought.ÂÂ  Miller-El, 125
 S.Â Ct. at 2328.Â  

Â Â Â Â Â Â Â Â Â  The Supreme Court states that Âthe
StateÂs failure to engage in any meaningful voir dire examination on a subject
the State alleges it is concerned about is evidence suggesting that the
explanation is a sham and a pretext for discrimination.ÂÂ  Miller-El, 125
S.Â Ct. at 2328 (quoting Ex parte Travis, 776 So.2d 874, 883 (Ala. 2000)) (alteration in Miller-El).

Â Â Â Â Â Â Â Â Â  Fields testified as follows concerning
his brotherÂs criminal history:

ÂQÂ Â Â Â Â Â Â Â  Could you tell me a little bit about
that?Â

ÂAÂ Â Â Â Â Â Â Â  He was arrested and convicted on [a]
number of occasions for possession of a controlled substance.Â

ÂQÂ Â Â Â Â Â Â Â  Was that here in Dallas?Â

ÂAÂ Â Â Â Â Â Â Â  Yes.Â

ÂQÂ Â Â Â Â Â Â Â  Was he involved in any trials or
anything like that?Â

ÂAÂ Â Â Â Â Â Â Â  I suppose of sorts.Â  I donÂt really
know too much about it.Â

ÂQÂ Â Â Â Â Â Â Â  Was he ever convicted?Â

ÂAÂ Â Â Â Â Â Â Â  Yeah, he served time.Â

ÂQÂ Â Â Â Â Â Â Â  Do you feel that that would in any
way interfere with your service on this jury at all?Â

ÂAÂ Â Â Â Â Â Â Â  No.Â

Miller-El, 125 S.Â Ct. at 2327 (quoting App. at 190) (alteration in Miller-El).

Â Â Â Â Â Â Â Â Â  The other strike on which the Supreme
Court performs a comparative analysis is Warren.Â  At the Batson hearing
after remand, the prosecutor gave the following reason for striking Warren:

I
thought [WarrenÂs statements on voir dire] were inconsistent responses.Â 
At one point he says, you know, on a case-by-case basis and at another point he
said, well, I thinkÂI got the impression, at least, that he suggested that the
death penalty was an easy way out, that they should be made to suffer more.

Miller-El, 125 S.Â Ct. at 2329 (quoting App. at 909) (alteration in Miller-El).

Â Â Â Â Â Â Â Â Â  On voir dire, when asked Âwhat the
death penalty accomplished,Â Miller-El, 125 S.Â Ct. at 2329, Warren testified:

I donÂt know.Â  ItÂs
really hard to say because I know sometimes you feel that it might help to
deter crime and then you feel that the person is not really suffering.Â  YouÂre
taking the suffering away from him.Â  So itÂs like I said, sometimes you have
mixed feelings about whether or not this is punishment or, you know, youÂre
relieving personal punishment.

Id.
(quoting 3 R. at 1532).

Â Â Â Â Â Â Â Â Â  The Supreme Court points to the
StateÂs Âfailure to object to other panel members who expressed views much like
 WarrenÂs.Â Miller-El, 125 S.Â Ct. at 2329.Â  ÂThe fact that [the
prosecutor]Âs reason also applied to these other panel members, most of them
white, none of them struck, is evidence of pretext.ÂÂ  Id. at 2330.Â  The
Court points to the following panelistsÂ testimony: 

Â·Â Â Â Â 
Duke: Â[S]ometimes death
would be better to me thanÂbeing in prison would be like dying every day and,
if you were in prison for life with no hope of parole, I[Âd] just as soon have
it over with than be in prison for the rest of your life.ÂÂ  Id. at
2329-30 (quoting App. at 372) (second alteration in Miller-El).

Â·Â Â Â Â 
Woods (Âthe one black
panelist to serve as juror,Â Miller-El at 2330): Â[C]apital punishment
Âis too easy.Â  I think thatÂs a quickÂ  relief .Â .Â .Â .Â  I feel
like [hard labor is] more of a punishment than putting them to sleep.ÂÂÂ  Id. (quoting App. at 408) (second alteration in Miller-El).

Â·Â Â Â Â 
Jenkins: Â[A] harsher
treatment is life imprisonment with no parole.ÂÂ  Id. (quoting App. at
542).

Â·Â Â Â Â 
Girard: Â[L]iving sometimes
is a worseÂis worse to me than dying would be.ÂÂ  Id. (quoting App. at
624).Â  

Â Â Â Â Â Â Â Â Â  The State also alleged that it struck Warren because of WarrenÂs brother-in-lawÂs criminal history.Â  Miller-El, 125 S.Â Ct. at 2330 n.8.Â  The brother-in-law was Âconvicted of a crime having to do with
food stamps for which he had to make restitution.ÂÂ  Id.Â  The Supreme
Court notes that the State Ânever questioned Warren about his errant relative
at all.ÂÂ  Id.Â  Â[T]he failure to ask undermines the persuasiveness of
the claimed concern.ÂÂ  Id.Â  That Court points to the following
Âcomparable,Â id., testimony:

Â·Â Â Â Â Â Â Â 
ÂDavisÂs husband had been
convicted of theft and received seven yearsÂ probation.ÂÂ  Id.

Â·Â Â Â Â Â Â Â 
ÂNixÂs brother was involved
in white-collar fraud.ÂÂ  Id.

Â·Â Â Â Â Â Â Â 
ÂVickeryÂs sister served
time in a penitentiary several decades ago.ÂÂ  Id.

Â Â Â Â Â Â Â Â Â  The next reason the Supreme Court
gives for finding a deprivation of equal protection in Miller-El is a
Âpattern[] of practice,Â Miller-El, 125 S.Â Ct. at 2332, the jury
shuffle.Â  That Court finds: ÂAt least two of the jury shuffles conducted by the
State make no sense except as efforts to delay consideration of black jury
panelists to the end of the week, when they might not even be reached.ÂÂ  Id. at 2339.Â  In particular, that Court points to the fact that the State did
not give any reason for requesting a jury shuffle: [10] ÂThe State notes
in its brief that there might be racially neutral reasons for shuffling the
jury, and we suppose there might be.Â  But no racially neutral reason has ever
been offered in this case, and nothing stops the suspicion of discriminatory
intent from rising to an inference.ÂÂ  Id. at 2333.Â  

Â Â Â Â Â Â Â Â Â  The next reason for which the Supreme
Court finds a deprivation of equal protection in Miller-El is the
StateÂs Âcontrasting voir dire questions.ÂÂ  Miller-El, 125 S.Â Ct. at 2333. Â The first sort of such questions concerns the panelistsÂ Â[t]houghts
on capital punishment.ÂÂ  Id.Â  Some of Âthe prosecutorsÂ statements
preceding questions about a potential jurorÂs thoughts on capital punishmentÂ
Âwere cast in general terms, but some followed the so-called graphic script,
describing the method of execution in rhetorical and clinical detail.ÂÂ  Id.Â  

Â Â Â Â Â Â Â Â Â  Â[F]or 94% of white venire panel
members, prosecutors gave a bland description of the death penalty before
asking about the individualÂs feelings on the subject.ÂÂ  Miller-El, 125 S.Â Ct. at 2334.Â  For example:

ÂI feel like it [is]
only fair that we tell you our position in this case.Â  The State of Texas .Â .Â . is actively seeking the death penalty in this case for Thomas Joe
Miller-El.Â  We anticipate that we will be able to present to a jury the
quantity and type of evidence necessary to convict him of capital murder and
the quantity and type of evidence sufficient to allow a jury to answer these
three questions over here in the affirmative.Â  A yes answer to each of those
questions results in an automatic death penalty from Judge McDowell.Â

Id.
at 2334 (quoting App. at 564-65) (alterations in Miller-El).[11]

Â Â Â Â Â Â Â Â Â  On the other hand, Â[o]nly 6% of white
venire panelists, but 53% of those who were black, heard a different
description of the death penalty .Â .Â .Â .ÂÂ  Miller-El, 125
 S.Â Ct. at 2334.Â  For example:

ÂI
feel like you have a right to know right up front what our position is.Â  [We],
representing the people of Dallas County and the state of Texas, are actively
seeking the death penalty for Thomas Joe Miller-El .Â .Â .Â .Â

ÂWe do that with the
anticipation that, when the death penalty is assessed, at some point Mr. Thomas
Joe Miller-ElÂthe man sitting right down thereÂwill be taken to Huntsville and
will be put on death row and at some point taken to the death house and placed
on a gurney and injected with a lethal substance until he is dead as a result
of the proceedings that we have in this court, on this case.Â  So thatÂs
basically our position going into this thing.Â

Id.
(quoting App. at 572-73) (ellipsis in Miller-El).

Â Â Â Â Â Â Â Â Â  The other Âcontrasting voir dire questionsÂ
in Miller-El concerned the range of punishment.Â  The Supreme Court calls
this questioning ÂtrickeryÂ and a Âruse.ÂÂ  Miller-El, 125 S.Â Ct. at 2337, 2338 n.34.Â  ÂThe prosecutors asked members of the panel how low a
sentence they would consider imposing for murder.Â  Most potential jurors were
first told that Texas law provided for a minimum term of five years
.Â .Â .Â .ÂÂ  Id. at 2337.[12]Â  Â[B]ut some members of the panel were not, and
if a panel member then insisted on a minimum above five years, the prosecutor
would suppress his normal preference for tough jurors and claim cause to
strike.ÂÂ  Id.; see Johnson v. State, 982 S.W.2d 403, 405
(Tex. Crim. App. 1998).Â  ÂNinety-four percent of whites were informed of the
statutory minimum sentence, compared [with] only twelve and a half percent of
African-Americans.ÂÂ  Miller-El at 2337 (quoting Miller-El v.
Cockrell, Â 537 U.S. at 345) (alteration in Miller-El v. Dretke).Â  

Â Â Â Â Â Â Â Â Â  The last reason for which the Supreme
Court found a deprivation of equal protection in Miller-El was the
StateÂs Âpolicy.ÂÂ  Miller-El, 125 S.Â Ct. at 2338-39.Â  That Court
states, ÂWe know that for decades leading up to the time this case was tried prosecutors
in the Dallas County office had followed a specific policy of systematically
excluding blacks from juries .Â .Â .Â .Â[13]Â  Id. at 2338.Â  That Court cites
the testimony of two witnesses:

ÂA Dallas County district judge testified that, when he had served in the District AttorneyÂs
Office from the late-1950Âs to early-1960Âs, his superior warned him that he
would be fired if he permitted any African-Americans to serve on a jury.Â 
Similarly, another Dallas County district judge and former assistant district
attorney from 1976 to 1978 testified that he believed the office had a
systematic policy of excluding African-Americans from juries.Â

Id. at
2338-39 (quoting Miller-El v. Cockrell at 334).

Â 

Â Â Â Â Â Â Â Â Â  ÂOf more
importance, the defense presented evidence that the District AttorneyÂs Office
had adopted a formal policy to exclude minorities from jury service
.Â .Â .Â .Â  A manual entitled ÂJury Selection in a Criminal CaseÂ
[sometimes known as the Sparling Manual] was distributed to prosecutors.Â  It
contained an article authored by a former prosecutor (and later a judge) under
the direction of his superiors in the District AttorneyÂs Office, outlining the
reasoning for excluding minorities from jury service.Â  Although the manual was
written in 1968, it remained in circulation until 1976, if not later, and was
available at least to one of the prosecutors in Miller-ElÂs trial.Â

Miller-El, 125 S.Â Ct. at 2339 (quoting Miller-El v. Cockrell at
334-35) (alterations in Miller-El v. Dretke).

Â Â Â Â Â Â Â Â Â  There are at least two ways in which Miller-El
v. Dretke may somewhat alter how Texas appellate courts evaluate Batson
cases: (1)Â the degree of similarity required in the comparative analysis,
and (2)Â the insistence that the courts analyze the precise reasons given
by the State for the StateÂs strikes.

Â Â Â Â Â Â Â Â Â  The first of these modifications to
the Batson analysis pertains to the Âcomparative juror analysisÂ or
Âside-by-side comparison[].ÂÂ  See Miller-El, 125 S.Â Ct. at 2325.Â 
In his dissent in Miller-El, Justice Thomas criticized the majorityÂs
comparative analysis of the StateÂs reason for striking Warren.Â  Miller-El, 125
S.Â Ct. at 2354 (Thomas, J., dissenting); see Miller-El, 125
S.Â Ct. Â at 2326-29.Â  Justice Thomas writes:

The majority thinks it
can prove pretext by pointing to white veniremen who match only one of the
StateÂs proffered reasons for striking Warren.Â  [Miller-El v. Dretke] at
2329-2330.Â  This defies logic.Â  ÂÂSimilarly situatedÂ does not mean matching
any one of several reasons the prosecution gave for striking a potential
jurorÂit means matching all of them.ÂÂ  Miller-El [v. Cochran],
537 U.S., at 362-363, 123 S. Ct. 1029 (THOMAS, J., dissenting).Â  Given limited
peremptories, prosecutors often must focus on the potential jurors most likely
to disfavor their case.Â  By ignoring the totality of reasons that a prosecutor
strikes any particular venireman, it is the majority that treats potential
jurors as Âproducts of a set of cookie cutters,Â [Miller-El v. Dretke],
at 2329, n.Â 6Âas if potential jurors who share only some among many traits
must be treated the same to avoid a Batson violation.Â  Of course jurors
must not be Âidentical in all respectsÂ to gauge pretext, [id.], but to
isolate race as a variable, the jurors must be comparable in all respects that
the prosecutor proffers as important.Â  This does not mean Âthat a defendant
cannot win a Batson claim unless there is an exactly identical white
juror.ÂÂ  [Id.]Â  It means that a defendant cannot support a Batson
claim by comparing veniremen of different races unless the veniremen are truly
similar.

Miller-El
at 2354 (Thomas, J.,
dissenting) (some internal citations omitted).

Â 

Â Â Â Â Â Â Â Â Â  The
majority replied:

Â 

None
of our cases announces a rule that no comparison is probative unless the
situation of the individuals compared is identical in all respects, and there
is no reason to accept one.Â  Nothing in the combination of [the venireman]Âs
statements about rehabilitation and his brotherÂs history discredits our
grounds for inferring that these purported reasons were pretextual.Â  A per
se rule that a defendant cannot win a Batson claim unless there is
an exactly identical white juror would leave Batson inoperable;
potential jurors are not products of a set of cookie cutters.

Miller-El,
125 S.Â Ct. at 2329 n.6.

Â 

Â Â Â Â Â Â Â Â Â  Some Texas cases have used reasoning
similar to Justice ThomasÂs:Â  

Â 

As
a technique for challenging strike explanations, comparative analysis is
strongest when only one characteristic is offered in explanation.Â  Thus, if the
prosecutor states that two African-American panelists were struck because his voir
dire questioning indicated they were unemployed, but he failed to question
non-African-American panelists who had left the employment category blank in
their forms, substantial reason to question the genuineness of the strike
explanation is presented.Â  

43 George
E. Dix & Robert O. Dawson, Texas Practice: Criminal Practice and Procedure
Â§Â 35.133, at 554 (2d ed. 2001) (citing Emerson v. State, 851 S.W.2d
269, 274 (Tex. Crim. App. 1993)).

Even
if only one characteristic is given for striking a minority panelist and there
was a nonminority panelist to whom the same characteristic might apply, that
does not necessarily show racial animus in making the strike.Â  The panelist not
struck might also have characteristics for the state that are sufficiently positive
to outweigh the negative characteristic.

43 Dix
& Dawson Â§Â 35.111, at 554 (citing Whitsey v. State, 796
S.W.2d 707, 714 (Tex. Crim. App. 1989) (op. on orig. submission)).

When
the explanation for the strikes increases in complexity, so that it encompasses
several characteristics for each strike, comparative analysis becomes less
useful as a challenging tool.Â  The process of decision-making in exercisingÂ 
strikes has been described as Ânot susceptible to rigid quantification; rather,
it is a fluid process, often hinging on the interaction of a number of
variables and permutations.ÂÂ  The fact that panelists not struck have some, but
not all, of the objectionable characteristics does not mean that the strike
explanation is not genuine.

43 Dix
& Dawson Â§Â 35.111, at 554-55 (quoting Cantu v. State,
842 S.W.2d 667, 689 (Tex. Crim. App. 1992)).

[W]hen the State has
offered more than one plausible reason for striking a venireperson, it is
proper to review these reasons in their entirety in order to assess whether the
StateÂs explanation was valid or merely pretextual.Â  Where, as here, the State
has offered numerous race neutral reasons for its challenge, we cannot say that
the fact that there were other acceptable jurors possessing one or more of
these objectionable attributes, is sufficient to establish disparate treatment.

Cantu,
842 S.W.2d Â at 689.

Â 

Â Â Â Â Â Â Â Â Â  For
example, as this Court has held:

Â 

[Appellant] fails to
identify any other juror with all of the characteristics for which any of the
challenged jurors were struck.Â  Although one may have had a similar job and
another may have revealed similar feelings regarding an officerÂs use of a
weapon during a traffic stop, none possessed the same combination of
characteristics as any of the challenged jurors.

Ealoms v. State, 983 S.W.2d 853, 857 (Tex. App.ÂWaco 1998, pet.
refÂd).

Â Â Â Â Â Â Â Â Â  Another possible change is in the
degree to which reviewing courts must evaluate the race-neutral reasons that
the prosecutor actually gave, and not speculate on reasons that the prosecutor
might properly have had.[14]Â  The Texas Court of Criminal Appeals has stated
that such is the law in Texas, but neither that Court nor the lower courts have
applied that law consistently. 

Â Â Â Â Â Â Â Â Â  In Miller-El, the Supreme Court
states that the federal ÂCourt of Appeals pretermittedÂ the ÂdifficultiesÂ in
accepting the StateÂs reasons Âby stating that the prosecutionÂs reason for
striking Warren was a more general ambivalence about the [death] penalty and
his ability to impose it.ÂÂ  Miller-El, 125 S.Â Ct. at 2332 (citing Miller-El
v. Dretke, 361 F.3d 849, 856-57 (5th Cir. 2004), reversed, 125 S.Â Ct. 2317)).Â  The Supreme Court calls this a Ârationalization,Â Miller-El at
2332:

[T]he
rule in Batson provides an opportunity to the prosecutor to give the
reason for striking the juror, and it requires the judge to assess the
plausibility of that reason in light of all evidence with a bearing on it.Â  It
is true that peremptories are often the subjects of instinct, and it can
sometimes be hard to say what the reason is.Â  But when illegitimate grounds
like race are in issue, a prosecutor simply has got to state his reasons as
best he can and stand or fall on the plausibility of the reasons he gives.Â  A Batson
challenge does not call for a mere exercise in thinking up any rational basis.Â 
If the stated reason does not hold up, its pretextual significance does not
fade because a trial judge, or an appeals court, can imagine a reason that
might not have been shown up as false.Â  The Court of AppealsÂs and the
dissentÂs substitution of a reason for eliminating [a panelist] does nothing to
satisfy the prosecutorsÂ burden of stating a racially neutral explanation for
their own actions.

Id.
at 2331-32 (internal citations omitted).

Â Â Â Â Â Â Â Â Â  The Court of Criminal Appeals has held
in an opinion denying a petition for discretionary review that Âat the core of Batson,
is the premise that the prosecutor must bring forward his explanation at
trial for his challenged peremptories .Â .Â .Â .ÂÂ  Young v.
State, 856 S.W.2d 175, 176 (Tex. Crim. App. 1993) (emphasis in orig.).Â  

ÂUndoubtedly,
it is the prosecutorÂs obligation to tender such explanations at the time first
called upon to do so in the trial court.Â  It is no sufficient substitute to let
her [prosecutor] offer them at a later time, certainly not on appeal or discretionary
review.Â  And it follows that any subsequent scrutiny by an appellate court of
the voir dire process must necessarily be for the limited purpose of
determining whether the prosecutorÂs tendered explanations can be refuted or
corroborated and not as a surrogate for the explanations themselves.Â

Id.
(quoting Wright v. State, 832 S.W.2d 601, 605 (Tex. Crim. App. 1992)
(Benavides, J., concurring)) (alteration in Young).Â  However, one
example of a Texas case in which a court considered a reason for a strike which
was not alleged by the prosecutor is Gibson v. Texas.Â  Gibson, 144
S.W.3d 530.Â  There, the Court of Criminal Appeals noted that, besides the
reasons the State alleged to distinguish venirepersons 7 and 11:

Veniremember
7 also stated that he believed a defendant should testify and Âexplain his
part.ÂÂ  The trial court could have reasonably determined that this was another
race-neutral motivation explaining why the prosecutor would peremptorily strike
veniremember 11 but not veniremember 7 and that the defense was overlooking
this significant distinction between these two veniremembers.

Id.
at 534.Â  There are probably many such cases, on the rationale that Âif the
trial courtÂs decision is correct on any theory of law applicable to the case,
the decision will be sustained.ÂÂ  See Barocio v. State, 158 S.W.3d 498,
501 (Tex. Crim. App. 2005); accord Ex parte Coleman, 157 Tex. Crim. 37, 44, 245 S.W.2d 712, 717 (1952) (op. on rehÂg); cf. Hailey v. State, 87
S.W.3d 118, 121 (Tex. Crim. App. 2002).

Â Â Â Â Â Â Â Â Â  In attempting to apply this law, a
recent Texas case has noted that the Supreme ÂCourt emphasized that a trial or
appellate court is limited in its review of the prosecutorÂs stated reason.ÂÂ  Fultz,
2005 Tex. App. LEXIS 10445, at *10.Â  ÂA court cannot search for any
reason, however rational, to support the prosecutorÂs strike.Â  Rather, it is
bound to consider only the prosecutorÂs stated reason.Â  This preserves the
prosecutorÂs burden to state a racially neutral reason for the strike.ÂÂ  Id. (emphasis in orig.).Â  ÂIn looking at the genuineness of the
StateÂs asserted motive, we are to limit our review to information provided in
the Batson hearing.ÂÂ  Id. at *11 (citing Wright, 832
S.W.2d at 605).Â  The Austin Court, however, while acknowledging that its review
was limited to the prosecutorÂs reasons for the strikes in the record,
continued to recognize the necessity of deference to the trial court:

Â Â Â Â Â Â Â Â Â  In this case, FultzÂs counsel
introduced the panel membersÂ criminal histories in an attempt to show that
Caucasian, strikeable panel members with ÂseriousÂ offenses remained on the
jury.Â  The issue is whether, when doing the side-by-side analysis required by Miller-El,
the criminal histories in the record show that Blake was the only panel member
struck for having committed a ÂseriousÂ offense, or whether panel members who
were not African-American were struck for their ÂseriousÂ offenses as well.

Â Â Â Â Â Â Â Â Â  The prosecutorÂs definition of
ÂseriousÂ offenses was far from clear.Â  In defining Âserious,Â we must limit
our review to what was established during the Batson hearing.Â  When the
prosecutor used the word ÂseriousÂ in the record, he stated that he was
targeting Âgreater than Class AÂ offenses.Â  The prosecutor then qualified his
definition by providing two examples of a ÂseriousÂ offense: driving while
intoxicated, which is in fact a Class B misdemeanor, see Tex. Pen.â Code Ann. Â§Â 49.04(b) (West 2003), and
sexual assault, a felony, see id. Â§Â 22.011(f) (West Supp.
2004-05).Â  Taken as a whole, the prosecutor defined ÂseriousÂ both by explanation
and examples.Â  Therefore, the trial court may have reasonably believed that
ÂseriousÂ offenses were not limited to Âgreater than Class AÂ offenses, but
included certain misdemeanors as well.[*]

Â Â Â Â Â Â Â Â Â  In this case, we will defer to the
trial court in determining whether ÂseriousÂ offenses included certain
misdemeanors, such as driving while intoxicated.Â  The trial court is in the
best position to determine the meaning and sincerity of the parties.Â  Because
the State struck panel members who were not African-American with ÂseriousÂ offenses, the Defendant has not met his
burden of establishing that the 

StateÂs
asserted motive was not genuine.Â  The trial courtÂs ruling was not clearly erroneous.Â Â Â Â Â  

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  

Â Â  [*]Â  On appeal, the State argues that the
prosecutor intended ÂseriousÂ to mean Âan offense that was worse than a Class C
misdemeanor.ÂÂ  We find this position to be unsupported by the record.

Fultz,
2005 Tex. App. LEXIS 10445, at
*12-*14 (some internal citations omitted).

Â 

Keeping these modifications in mind, I turn to
DenseyÂs case.Â  Densey argues:

Â 

Â Â Â Â Â Â Â Â Â  The brief factual review of the record
in the Memorandum Opinion fails to address the similarities in this case to Miller-El
and why, under the facts presented in Miller-El under a similar
appellate standard, the Supreme Court found a pretext to be so pervasive that
it chose the following declarative language:

Â 

It
blinks reality to deny the State struck [the challenged jurors], including in
that 91% because they were black.Â  The strikes correlate with no fact as well
as they correlate with race and they occurred during a selection effected by
shuffling a disparate questioning that race explains better than any race
neutral reason advanced by the State.

(Mot. RehÂg at 6 (purporting to quote Miller-El
at 2340) (alterations by Dempsey).)Â  Under the established standard of review,
Densey is not entitled to relief.

Â Â Â Â Â Â Â Â Â  Several cases have noted the
extraordinary combination of circumstances that contributed to the finding in Miller-El.Â 
The highest courts of at least two states have done so.Â  The Kentucky Supreme
Court, first, noted in McPherson v. Kentucky:

The
trial courtÂs decision is entitled to great deference.Â  We recognize that the
U.S. Supreme Court recently overturned a decision despite such deference, and
sustained an equal protection challenge based on racial discrimination in jury
selection.Â  However, in Miller-El v. Dretke, .Â .Â . the
defendant presented overwhelming evidence that the prosecutorÂs neutral
explanations were pretextual.Â  Specifically, the defendant had presented
evidence that the district attorneyÂs office had a history of systematically
attempting to exclude minorities from juries, including testimony that a
procedure known as Âjury shuffleÂ had been used by the office in the past
specifically to manipulate the racial composition of the jury pool.

Additionally,
the Court concluded that some of the prosecutorÂs proffered explanations for
striking African-Americans from the jury pool were equally applicable to white
jurors whom the prosecutor declined to peremptorily strike.Â  Moreover, in
explaining his reasons for striking these potential jurors, the prosecutor
mischaracterized some of the testimony they gave during voir dire.Â  When this
mischaracterization was pointed out, the prosecutor offered another reason for
the strike rather than respond or defend his initial explanation.Â  The Court
found that Âit would be difficult to credit the StateÂs new explanation, which
reeks of afterthought,Â supporting the defendantÂs contention that the
prosecutorÂs neutral explanations were pretextual. 

In
the instant case, there are no similar circumstances which would indicate that
the prosecutorÂs proffered reasons for his strikes were a pretext for gender
discrimination.

McPherson v. Commonwealth, 171 S.W.3d 1, 3-4 (Ky. 2005) (mem. op.)
(internal footnotes omitted) (quoting Miller-El, 125 S.Â Ct. at
2328).

Â Â Â Â Â Â Â Â Â  Similarly, the Louisiana Supreme Court
held in Louisiana v. Allen:

Â 

[W]e
do not find that the defendantÂs argument that the State through the exercise
of its five peremptory challenges against the African-American jurors
effectively excluded Âabout 62 1/2 percentÂ of the eight minority persons
present on the panel demonstrates a discernable pattern of discriminatory
intent or sufficient to rise to the level of discriminatory intent found in Miller-El
v. Dretke (finding discriminatory intent because (1)Â State
peremptorily struck ten of eleven eligible African-American venire members;
(2)Â StateÂs reasons for exercising peremptory strikes against some
African-American panel members appeared equally on point as to some white
jurors who served; (3)Â StateÂs shuffling of the venire panel (at least two
of the StateÂs jury shuffles make no sense except as efforts to delay
consideration of African-American panelists to the end of the week, when they
might not even be reached); (4)Â StateÂs Âenquiry into views on the death
penaltyÂ (53% of African-American panelists but only 3% of
non-African-Americans were questioned with a graphic script meant to induce
qualms about applying the death penalty); (5)Â StateÂs questioning about
acceptable minimum sentences (100% of African-Americans but only 27% of
non-African-Americans were subjected to trick questions about minimum accepted
penalties for murder); (6)Â widely known evidence of the general policy of
the DallasÂ  CountyÂ  DistrictÂ  AttorneyÂsÂ  OfficeÂ  toÂ  excludeÂ  African-American
venire members from juries at the time Miller-ElÂs jury was selected (Sparling
Manual)).

State v. Allen, 03-2418, p. 19; 913 So.2d. 788, 803 (La. 6/29/05) (internal citations omitted) (quoting Miller-El, 125 S. Ct. at 2317,
2325-26, 2332, 2339, 2340).

Â Â Â Â Â Â Â Â Â  The federal courts of appeals have
similarly distinguished Miller-El on its facts.Â  For example, in Murphy
v. Dretke, the Fifth Circuit held:

Here, we have thoroughly combed the record of
the voir dire conducted in MurphyÂs state court capital murder trial;
and our detailed Âside-by-side comparisons of black venire panelists who were
struck and white panelists allowed to serveÂ do not indicate that any
differences in questioning or treatment resulted from pretextual racial bias.Â  See
Miller-El [v. Dretke], 125 S.Ct. at 2325 (noting the
evidentiary strength of such close comparisons).Â  Moreover, there is neither
evidence in this record of: (i)Â any, much less multiple, jury shuffles
occurring in the state trial court which resulted in the increasingly lower
statistical presence of African American venirepersons within the jury venire;
nor (ii)Â a 20-year-old, or indeed any, manual from the State District
Attorney and other testimonial evidence suggesting the historic use of
peremptory strikes against African-American venirepersons during jury
selection, both of which were decisive factors in Miller-El [v.
Dretke].Â  Id. at 2332, 2338-40.

Murphy,
416 F.3d at 439.Â  Similarly, the
Second Circuit has held:

Â 

In
this case there is little evidence, certainly not amounting to the Âclear and
convincingÂ evidence required, that [the trial judge]Âs finding that the
petitioners did not establish that the respondentsÂ race-neutral reasons were a
pretext for purposeful discrimination was incorrect.Â  Although the petitioners
are correct that the statistical profile of jury selection in this case, with
twelve of fifteen African-American prospective jurors dismissed, is not
dissimilar from that in Miller-El II, where ten of eleven
African-American prospective jurors were dismissed peremptorily, see
Miller-El II, 125 S.Ct. at 2339, the Miller-El decisions do not help
the petitioners here.Â  In Miller-El II, in which the Supreme Court
ordered habeas relief based on the petitionerÂs Batson claim, the
prosecution failed to provide plausible, race-neutral explanations for its
decisions to peremptorily challenge various prospective jurors and not to
challenge others.Â  Id. at 2340.Â  Neither is there evidence in this case
of Âbroader patterns of [discriminatory] practiceÂ like those found in Miller-El
II, which included evidence of Âjury shufflingÂÂi.e., Ârearranging
the order in which members of a venire panel are seated,Â in order to reduce
the number of black jurorsÂevidence of discriminatory questioning, and Âwidely
known evidence of the general policy of the .Â .Â . District AttorneyÂs
Office to exclude black venire members from juries.ÂÂ  Id. at 2332.

Majid,
428 F.3d at 130-31 (alterations
in Majid).

Â 

Â Â Â Â Â Â Â Â Â  The
Austin Court of Appeals distinguished Miller-El on its facts in this
way:

Â 

Â Â Â Â Â Â Â Â Â  In
Miller-El, the U.S. Supreme Court required a side-by-side comparison of
African-American and Caucasian jurors when addressing a race-based Batson
challenge.Â  Miller-El v. Dretke, 125 S.Ct. 2317, 2325 (2005).Â  If Âa
prosecutorÂs proffered reason for striking a black panelist applies just as
well to an otherwise-similar nonblack who is permitted to serve, that is
evidence tending to prove purposeful discrimination.ÂÂ  Id. at 2325.Â  In Miller-El,
the prosecutor had peremptorily stricken an African-American panel member for
favoring rehabilitation over the death penalty.Â  Id. at 2326-27.Â 
However, the record showed ÂunequivocallyÂ that the panel member believed the
death penalty could be imposed without rehabilitation.Â  Id. at 2327.Â 
More importantly, the record also showed that there were several Caucasian
panelists who had reservations against the death penalty because they favored
rehabilitation.Â  Id.Â  

Fultz, 2005
 Tex. App. LEXIS 10445, at *9-*10.[15]

Â Â Â Â Â Â Â Â Â  In a civil case, too, a Texas court has distinguished Miller-El.Â  See Davis v. Fisk Elec. Co., No.
14-04-00790-CV, 2006 Tex. App. LEXIS 282 (Tex. App.ÂHouston [14th Dist.] Jan.
12, 2006, pet. filed).Â  There:

Â Â Â Â Â Â Â Â Â  Fisk shuffled the jury before voir
dire.Â  Seven of the twelve African-Americans on the panel were in the top
twenty-five of the forty panelists when Fisk shuffled.Â  Based on this fact
alone, Davis asserts that ÂFiskÂs decision to shuffle the jury was based solely
on its visual appearanceÂ and therefore, under Miller-El, erodes the
credibility of FiskÂs assertion that its strikes were race-neutral.Â  See
Miller-El v. Dretke, 162 L. Ed. 2d 196, 125 S. Ct. 2317, 2332-33 (2005). 

Davis at
*16 n.2.Â  The Fourteenth Court of Appeals held:

Â 

The Court in Miller-El held that the
prosecutorÂs shuffles were a factor suggesting discrimination not only because
of the predominant number of African-Americans at the front of the panel but
also because the prosecution delayed making its objection to the defenseÂs
shuffle until after the racial composition of the panel was revealed and the
district attorneyÂs office had admitted it had previously shuffled juries to
manipulate their racial composition.Â  There is no such additional evidence in
this case.

Id.
(citing Miller-El, 125 S.Â Ct. at 2333).

Â Â Â Â Â Â Â Â Â  The facts of the instant case are
likewise distinguishable.Â  I find in them nothing comparable to those in Miller-El.

Â Â Â Â Â Â Â Â Â  The State stands on the reasoning that
where Âthe State has offered numerous race neutral reasons for its challenge,Â
the court Âcannot say that the fact that there were other acceptable jurors
possessing one or more of these objectionable attributes, is sufficient to
establish disparate treatment.ÂÂ  (State Br. at 26 (quoting Cantu, 842
S.W.2d at 685); accord Resp. Mot. RehÂg at 9-10.)Â  This argument is
similar to the one that the Supreme Court rejected in Miller-El.Â  See
Miller-El, 125 S.Â Ct. at 2329.

Â Â Â Â Â Â Â Â Â  Densey argues entirely under Batson,
without reference to the Texas statute.Â  See Tex. Code Crim. Proc. Ann. art. 35.261 (Vernon 1989).Â  Under Batson
and its federal progeny, and the Texas Court of Criminal AppealsÂs
precedent in accordance therewith, ÂÂthe trial courtÂs decision on the ultimate
question of discriminatory intent .Â .Â .Â .Â .Â . will not be
overturned unless clearly erroneous.ÂÂ  Miller-El v. Cockrell, 537 U.S. at 1041 (quoting Hernandez, 500 U.S. at 364); accord Gibson, 144 S.W.3d at 534; DeBlanc
v. State, 799 S.W.2d 701, 713 (Tex. Crim. App. 1990); Whitsey, 796
S.W.2d at 721 (1990) (op. on rehÂg) (plurality op.).Â  ÂTo determine whether the
factfinderÂs decision is Âclearly erroneous,Â appellate courts look to the
record to see if they are Âleft with the Âdefinite and firm conviction that a
mistake has been committedÂ.ÂÂÂ  Hill v. State, 827 S.W.2d 860, 865 (Tex.
Crim. App. 1992) (quoting United States v. Fernandez, 887 F.2d 564, 567
(5th Cir. 1989) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985))).Â  The trial courtÂs ruling is clearly erroneous when Âthe reviewing
court is left with a firm conviction that a mistake has been committed.ÂÂ  Robinson
v. State, 851 S.W.2d 216, 227 (Tex. Crim. App. 1991) (op. on orig.
submission); accord Hernandez at 369.Â  Â[I]f an appellate court
accepts a trial courtÂs finding that a prosecutorÂs race-neutral explanation
for his peremptory challenges should be believedÂ at the second stage of the Batson
procedure, the Supreme Court Âfail[s] to see how the appellate court
nevertheless could find discriminationÂ at the third stage.Â  Miller-El v.
Cockrell, 537 U.S. at 339-40 (quoting Hernandez at 367).Â  

Â Â Â Â Â Â Â Â Â  Courts Âreview the record of the Batson
hearing and the voir dire examination in the light most favorable to the
trial courtÂs ruling.ÂÂ  Adanandus v. State, 866 S.W.2d 210, 224 (Tex.
Crim. App. 1993); accord Camacho v. State, 864 S.W.2d 524, 528 (Tex.
Crim. App. 1993); Cantu, 842 S.W.2d at 689.Â  

Â Â Â Â Â Â Â Â Â  The Âclearly erroneousÂ standard is
Âanalytically and intellectually the same asÂ the Âsupported by the recordÂ
standard.Â  Hill, 827 S.W.2d at 866; accord Goode v. Shoukfeh, 943
S.W.2d 441, 446 (Tex. 1997) (Âabuse of discretionÂ).Â  ÂIf supported by the
record, including the voir dire, the prosecutorÂs explanation of his use of a
peremptory challenge, the rebuttal by appellant and impeaching evidence, the decision
of the trial court will not be clearly erroneous.ÂÂ  Camacho, 864 S.W.2d
at 528.Â  ÂWhere there are two permissible views of the evidence, the
factfinderÂs choice between them cannot be clearly erroneous.ÂÂ  Hernandez,
500 U.S. at 369.Â  ÂWhen the evidence in the record is susceptible to two
reasonable interpretations and the trial courtÂs decision is in accord with one
of those interpretations, then the trial courtÂs choice between those
interpretations may not be deemed clearly erroneous.ÂÂ  Trevino v. State, 864
S.W.2d 499, 500 (Tex. Crim. App. 1993).

Â Â Â Â Â Â Â Â Â  ÂUnder Batson, a defendant is
permitted to establish from Âthe totality of relevant facts,Â 476 U.S., at 94, 106 S.Ct., at 1721, that black jurors have been excluded on the basis of race
and that the system of peremptory challenges has been operated in a
discriminatory fashion.ÂÂ  Holland v. Illinois, 493 U.S. 474, 516 (1990); accord Williams v. State, 773 S.W.2d 525, 535 (Tex.
Crim. App. 1988) (op. on orig. submission) (ÂUnder Batson, the totality
of the circumstances of the particular case must be examined to determine
whether an inference of misconduct by the state has been established.Â)
(quoting State v. Holder, 745 P.2d 141[, 145] (Az. 1987)); Keeton v.
State, 749 S.W.2d 861, 865 (Tex. Crim. App. 1988).Â  ÂTo determine whether
the trial courtÂs ruling was in fact Âclearly erroneous,ÂÂ the court
Âexamine[s] the entire record .Â .Â .Â .ÂÂ  Molina v. Pigott, 929
S.W.2d 538, 545 (Tex. App.ÂCorpus Christi 1996, writ denied).Â  

Â Â Â Â Â Â Â Â Â  Â[T]he critical question in determining
whether a prisoner has proved purposeful discrimination .Â .Â . is the
persuasiveness of the prosecutorÂs justification for his peremptory strike.ÂÂ  Miller-El
v. Cockrell, 537 U.S. at 338-39 (citing Purkett, 514 U.S. at 768).Â  Â[I]mplausible or fantastic justifications may (and probably will) be found
to be pretexts for purposeful discrimination.ÂÂ  Id. at 339 (quoting Purkett
at 768).Â  Among the factors to consider in evaluating the explanations for
a strike are:

Â·Â Â Â Â  Âthe prosecutorÂs demeanorÂ;

Â·Â Â Â Â  Âhow reasonable, or how improbable, the
explanations areÂ; and

Â·Â Â Â Â  Âwhether the proffered rationale has some basis
in accepted trial strategy.ÂÂ  

Miller-El v. Cockrell, 537 U.S. at 339.Â  

Â Â Â Â Â Â Â Â Â  The Court of Criminal Appeals
sometimes Âemploy[s] a set of factors deemed useful in making a determination
that the StateÂs proffered race-neutral reasons are supported by the record, as
well as the trial courtÂs findings.ÂÂ  Williams v. State, 804 S.W.2d 95,
105-106 (Tex. Crim. App. 1991); see Whitsey, 796 S.W.2d at 713-14 (op.
on orig. submission); Keeton, 749 S.W.2d at 868.Â  Those factors are:

1.Â Â Â Â Â Â  The
reason given for the peremptory challenge is not related to the facts of the
case;

2.Â Â Â Â Â Â  there
was a lack of questioning to the challenged juror or a lack of meaningful
questions;

3.Â Â Â Â Â Â  Disparate
treatmentÂpersons with the same or similar characteristics as the challenged
juror were not struck;

4.Â Â Â Â Â Â  Disparate
examination of members of the venire, i.e., questioning a challenged juror so
as to evoke a certain response without asking the same question of other panel
members;

5.Â Â Â Â Â Â  an
explanation based on a group bias where the group trait is not shown to apply
to the challenged juror specifically.

Williams, 804 S.W.2d at 106 (citing Slappy v. State, 503 So.2d 350
(Fl. Dist. Ct. App. 1987), affÂd, 522 So.2d 18 (Fla. 1988)).Â  

Â Â Â Â Â Â Â Â Â  ÂAs in any equal protection case, the
burden is, of course, on the defendant who alleges discriminatory selection of
the venire to prove the existence of purposeful discrimination.ÂÂ  Batson, 476
 U.S. at 93 (internal quotation marks omitted); see Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 270 n.21 (1977).Â  The Court of
Criminal Appeals has held that the standard of proof is by the preponderance of
the evidence: ÂBatson, its progeny, the line of equal protection
discrimination cases from which Batson was born, and our cases following
Batson have uniformly held that it is the challengerÂs burden to prove
discrimination by a preponderance of the evidence, not the actorÂs burden to
prove a negative.ÂÂ  Guzman v. State, 85 S.W.3d 242, 255 n.48 (Tex. Crim.
App. 2002).Â  In other words, the defendant must Âshow, by a preponderance of
the evidence, that the prosecutorÂs strike of [a] juror .Â .Â . was
based on or because of .Â .Â . discrimination.ÂÂ  Id. at 255; accord
Tompkins v. State, 774 S.W.2d 195, 202 (Tex. Crim. App. 1987), affÂd by
an equally divided court, 490 U.S. 754 (1989) (per curiam).

Â Â Â Â Â Â Â Â Â  In
reviewing DenseyÂs Batson claim, I am not Âleft with a firm conviction
that a mistake has been committedÂ in the trial courtÂs overruling the Batson
objection.Â  Cf. Robinson, 851 S.W.2d at 227; Hernandez, 500 U.S. at 369.

DenseyÂs trial
objection was: 

Judge, itÂs ourÂitÂs our position that the State
struck two-thirds of the African-American representation on the panel, that Mr.
Hall and MissÂJuror No. 1, Mr. Hall, and Juror No. 2, Miss Jones, answered all
questions in the appropriate manner.

(2
R.R. at 172.)[16]

Â 

Â Â Â Â Â Â Â Â Â  The State gave the following reasons
as its race-neutral reasons for the strikes:

Â 

The StateÂs race-neutral reason for striking
Juror No. 1, Richard Hall, Richard Hall knew the defendant and went to school
with him.Â  Also, that he has seen crack cocaine and that he is a rehabilitation
juror.Â  And the State is going to proceed on a non-rehabilitation theory in
this case.

(2
R.R. at 172.)

Â 

The StateÂs race-neutral allocationÂor race
neutral reason for striking Juror No. 2, Audrey Jones, is that sheÂs seenÂshe
knew crack, people that have smoked crack.Â  She is a rehabilitation juror.Â  She
also is one of the only jurors, by my count, to put ÂdeterrenceÂ as the No. 3
reason for punishment.

(2 R.R. at 172-73.)

Â Â Â Â Â Â Â Â Â  First, Densey complains of the StateÂs
striking panelist Hall.Â  As to HallÂs acquaintance with Densey, Densey argues:
ÂPanelist Gaines also knew Appellant.Â  Panelist Conerway, who made the jury,
said that although she did not know Appellant personally, that she knew
AppellantÂs sister.ÂÂ  (Densey Br. at 22 (record citations omitted).)

Â Â Â Â Â Â Â Â Â  A panelistÂs acquaintance with the
defendant can be a race-neutral reason for striking the panelist.Â  See
DeBlanc, 799 S.W.2d at 712, 713.Â  

Â Â Â Â Â Â Â Â Â  Hall testified that he was acquainted
with Densey from going to school with him:

Â Â Â Â Â Â Â Â Â  [Q:]Â  Does anybody else know Mr. Densey?

Mr. Hall?Â  How do you know Mr. Densey?

Â Â Â Â Â Â Â Â Â  [A]:Â  From school.Â  Basically through school.Â  We
was, like, classmates.Â  I was behind him in class, but we went to the same
school.

Â Â Â Â Â Â Â Â Â  [Q]:Â  Do you think that this is the kind of jury
you want to be in?Â  Do you think you can be fair and impartial, seeing that you
know him?

Â Â Â Â Â Â Â Â Â  [A]:Â  I believe I can.

Â Â Â Â Â Â Â Â Â  [Q]:Â 
Okay.Â  You can.Â  Great.Â  Thank you. 

Â (2 R.R. at 48.)

Â Â Â Â Â Â Â Â Â  Gaines and Conerway were not as
closely associated with Densey as was Hall.Â  GainesÂs association with Densey
was indirect, through GainesÂs brother.Â  Gaines testified as follows:

Â Â Â Â Â Â Â Â Â  [Q:]Â  Mr. Gaines, now, you know the defendant,
right, in this case?

Â Â Â Â Â Â Â Â Â  [A]:Â  Yes.

Â Â Â Â Â Â Â Â Â  [Q]:Â  AndÂMr. Densey.Â  And how do you know Mr.
Densey?

Â Â Â Â Â Â Â Â Â  [a]:Â  I grew up with his younger brother.

Â Â Â Â Â Â Â Â Â  [Q]:Â  Okay.Â  AndÂyou know, I probably wouldnÂt want
to be on a jury where I knew a friend.Â  I would hate to be put in a position of
somebody thinking I might skew it towards this man or worse, convict him and
sent him to prison.Â  It would be tough for me to do that.Â  Do you think that
this is a case that you should be on?

Â Â Â Â Â Â Â Â Â  [A]:Â  IÂif yÂall pick me, IÂd be here.

Â Â Â Â Â Â Â Â Â  [Q]:Â  I mean butÂyouÂd be fair, do you thinkÂ

Â Â Â Â Â Â Â Â Â  [A]:Â  Yes, sir.

Â Â Â Â Â Â Â Â Â  [Q]:Â  Âseeing that you know him and grew up with
him and that kind of thing?Â  Do you think you could fair?Â  

Â Â Â Â Â Â Â Â Â  [A:]Â  It wouldnÂt matter to me.

Â Â Â Â Â Â Â Â Â  [Q]:Â  So you can be fair and impartial?

Â Â Â Â Â Â Â Â Â  [A]:Â 
Yeah.

(2 R.R. at 47-48.)Â  

Â Â Â Â Â Â Â Â Â  Conerway, moreover, as
Densey acknowledges, (Densey Br. at 22), testified that she did not know
Densey.Â  Conerway testified as follows:

Â Â Â Â Â Â Â Â Â  [Q:]Â  Does anybody else know Mr. Densey?

Â Â Â Â Â Â Â Â Â  .Â .Â .Â .

Anybody else?Â  Yes, Miss Conerway?

Â Â Â Â Â Â Â Â Â  [A]:Â  I know his sister.

Â Â Â Â Â Â Â Â Â  [Q]:Â  You donÂt know him personally, though?

Â Â Â Â Â Â Â Â Â  [A]:Â  No.

Â Â Â Â Â Â Â Â Â  [Q]:Â  The fact that you know his sister, would that
cause you to be unfair at all?

Â Â Â Â Â Â Â Â Â  [A]:Â  No.

(2 R.R. at 48.)

Â Â Â Â Â Â Â Â Â  The next reason the State gave for striking Hall was that he Âha[d]
seen crack cocaine.ÂÂ  (2 R.R. at 172.)Â  HallÂs testimony is somewhat
distinguishable from that of the other panelists to whom Densey points.Â  Hall
is the only panelist who expressly testified that he had ÂseenÂ cocaine.Â  (Id.)

Â Â Â Â Â Â Â Â Â  A panelistÂs acquaintance with persons
connected to controlled substances can be a race-neutral reason for striking
the panelist.Â  E.g., Solomon v. State, 830 S.W.2d 636, 637 (Tex.
App.ÂTexarkana 1992, pet. refÂd) (striking panelist in part for being
Âacquainted with a family, several members of which had been convicted of drug
dealing or possession of drugsÂ held Ânot clearly erroneousÂ); Logans v.
State, No. 03-99-00348-CR, 2000 Tex. App. LEXIS 5296, at *7 (Tex.
App.ÂAustin Aug. 10, 2000, pet. refÂd) (not designated for publication)
(striking panelists in part for having Âknown two persons who died as a result
of a drug overdoseÂ and for being Ârelated to persons with drug problemsÂ held
Âracially neutralÂ explanations).

Â Â Â Â Â Â Â Â Â  As to Hall, Densey points to HallÂs
testimony on voir dire examination by the State:

Â Â Â Â Â Â Â Â Â Â Â Â  [Q:]Â  .Â .Â .Â .Â  Do
you think crack cocaine is a problem in our community? 

Â Â Â Â Â Â Â Â Â Â Â Â  [A]:Â  Yes. 

Â Â Â Â Â Â Â Â Â Â Â Â  [Q]:Â  Okay.Â  Have you had any
experience around crack cocaine a lot?Â  Have you seen any? 

Â Â Â Â Â Â Â Â Â Â Â Â  [A]:Â  IÂve seen it. 

Â Â Â Â Â Â Â Â Â Â Â Â  [Q]:Â  YouÂve seen it in the
community? 

Â Â Â Â Â Â Â Â Â Â Â Â  [A]:Â  (nods head.)

Â Â Â Â Â Â Â Â Â Â Â Â  [Q]:Â  How do you think crack
cocaine use affects our community?

Â Â Â Â Â Â Â Â Â Â Â Â  [A]:Â  There are a lot of ways.Â  It
causes people to take stuff that youÂve worked hard for and just causes a lot
of problems.Â  

Â Â Â Â Â Â Â Â Â Â Â Â  [Q]:Â  Okay.Â  So just someÂitÂs not
just the actual using of it.Â  ThereÂs other impacts that happen?

Â Â Â Â Â Â Â Â Â Â Â Â  [A]:Â  Yes.

Â Â Â Â Â Â Â Â Â Â Â Â  [Q]:Â  Some stealing.

Â Â  Have you ever known anybody thatÂs been a
victim of crack cocaine?

Â Â Â Â Â Â Â Â Â Â Â Â  [A]:Â  Yes.

Â Â Â Â Â Â Â Â Â Â Â Â  [Q]:Â  Okay.Â  Do you have any
personal experience on how they act?

Â Â Â Â Â Â Â Â Â Â Â Â  [A]:Â 
No.

(2 R.R. at 37-38.)[17]

Â Â Â Â Â Â Â Â Â  For purposes of comparison, Densey
points to the following testimony of the following panelists, (Densey Br. at
21-22):Â  

(1) Weslowski:Â  Â[C]rack cocaine Âsomewhat of a problem.ÂÂ

(2) Bingham: Â[E]xperience with a child whose mother was in
prison.Â

(3) Keys: Â[C]hildren had friends who were into drugs.Â

(4) Watson: Â[T]wo experiences; one involving
witnessing a drug deal in Houston, Texas.Â

(5) Rogers: Â[A]dopted grandchild was born a crack baby.Â [18]

Â Â Â Â Â Â Â Â Â  The prosecutor opened the line of
questioning in this way:

Â 

[H]ow do you feel
about crack cocaine in the community is all I want to know, okay?Â  I want to
get your general feeling on it.Â  Some people might not think itÂs a big deal.Â 
Some people may see that itÂs as a really big deal.Â  And some people might have
some personal experiences with it with friends, family members or other people.

[sic] (2 R.R. at 36-37.)

Â 

Â Â Â Â Â Â Â Â Â  Weslowski, first, testified that he
had no experience with drugs or drug users: 

Â 

Â Â Â Â Â Â Â Â Â  [Q]:Â  Okay.Â  Mr. Weslowski, do you
think crack cocaineÂs a problem in our community?

Â Â Â Â Â Â Â Â Â  [A]:Â  Oh, I think itÂsÂsure.Â  ItÂs
somewhat of a problem.

Â Â Â Â Â Â Â Â Â  [Q]:Â  Okay.Â  And do you think the
police are doing a good job of policing it?

Â Â Â Â Â Â Â Â Â  [A]:Â  Yeah, I think so.

Â Â Â Â Â Â Â Â Â  [Q]:Â  And do you have any personal
experiences around people youÂve known?

Â Â Â Â Â Â Â Â Â  [A]:Â  No.

Â Â Â Â Â Â Â Â Â  [Q]:Â  What about drug use, period?Â 
Have you ever had experience with people whoÂ

Â Â Â Â Â Â Â Â Â  [A]:Â 
Not really, no.

(2
R.R. at 39-40.)

Â 

Â Â Â Â Â Â Â Â Â  Bingham,
next, testified as to her experience with the child of a drug user:

Â 

Â Â Â Â Â Â Â Â Â Â Â Â  [Q]:Â  What about drug use, period?Â  Have you ever
had experience with people whoÂ

Â Â  .Â .Â .Â .

Â Â  .Â .Â .Â .Â 
How about you, Miss Bingham?

Â Â Â Â Â Â Â Â Â  [A:] I rememberÂthe only experience IÂve ever had is
with a child whose mother is not still in prison, who was a crack baby.Â  And it
justÂit hurts me to see him when I do see him, because heÂs having a lot of
problems.Â  HeÂs 11 years old.Â  And if someone doesnÂt really start giving him
individual attention that he really needs, heÂs going to end up in prison, as
well.Â  He doesnÂt understand.Â  He doesnÂt comprehend in the same way normal
people do because he was born with crack in his system.

Â Â Â Â Â Â Â Â Â  [Q]: So heÂs got a lifetime addiction?

Â Â Â Â Â Â Â Â Â  [A]: Well, no, heÂs not addicted to it now.Â  They
weaned him off of it fairly early, but itÂit caused a lot of brain damage
because she was using it during at least 50% of her pregnancy or more.Â  She was
using cocaine and other kinds of drugs.Â  And itÂs justÂhe needs someone who
understands his problem and to spend time in helping learn, to understand more
wording and things like that, to help out there.

Â Â Â Â Â Â Â Â Â  And he actsÂyou know, he acts at how
you react.Â  If youÂre nice to him and you try and you donÂt get frustrated at
him, then heÂs very, very good.Â  If you get agitated with him quickly, then he
doesnÂt know how to respond.Â  He doesnÂt know how to react.

Â Â Â Â Â Â Â Â Â  [Q]: How do you know this child?

Â Â Â Â Â Â Â Â Â  [A]: Well, my grandparents have lived in the
community for a long time and have been in the jail ministry, and thatÂs how
they knew of him, right after he was born.

Â Â Â Â Â Â Â Â Â  .Â .Â .Â .

Â Â Â Â Â Â Â Â Â  .Â .Â . My mother goes to the womenÂs prison in Bryan and does jail ministry once or twice a week.Â  And through that we met Miss Warren,
and just really kind of took this child underneath her wing and has been really
trying to help him.Â  But, you know, other than that one incident, IÂve never
had any kind of Âyou know, I really havenÂt had to deal with anything like
that.

Â Â Â Â Â Â Â Â Â  [Q]: YouÂve just seen some of the aftereffects,
right?

Â Â Â Â Â Â Â Â Â  [A]:
Yes.

(2
R.R. at 40-42.)

Â 

Â Â Â Â Â Â Â Â Â  Keys,
next, testified to her experiences with children who used drugs:

Â 

Â Â Â Â Â Â Â Â Â  [Q:]Â  Miss Keys?Â  Any experiences that youÂd like
to share, or do you think itÂs a problem in our community?

Â Â Â Â Â Â Â Â Â  [A]:Â 
I think itÂs a problem in a lot of communities, even in our own.Â  I work with
children. Â I teach.Â  IÂve seenÂI have kids ofÂmy own children, one in high
school and one in college, and have known that they had friends or known people
in high school and beyond that are into drugs and have seen how itÂs affected
their families.Â  Never anything immediate in our family.Â  IÂve not had that
kind of experience.Â  IÂve seen aftereffects, because like I said, I work with
children.Â  IÂm a P.E. teacher, so I work with every child on the campus.Â  IÂve
seen the effects afterwards, what happens to children, you know, but as in
having a strong opinionÂI mean, I think like most people, you know.Â  IÂm
against it.Â  But I understand that itÂs out there and that as a community we
need to work together to give people the help that we need to; itÂs so common. 

(2 R.R. at 42.)

Â Â Â Â Â Â Â Â Â  Watson, next, is the only other
panelist mentioned by Densey who might arguably have ÂseenÂ cocaine.Â  (2 R.R.
at 44.)Â  Watson testified as follows:

Â Â Â Â Â Â Â Â Â  [Q]:Â  How about you Mr. Watson.Â 
.Â .Â .Â .

Â Â Â Â Â Â Â Â Â  [A:]Â  I guess youÂre talking about personal
experience.

Â Â Â Â Â Â Â Â Â  [Q]: Yeah.

Â Â Â Â Â Â Â Â Â  [A]:Â  IÂve had two.Â  First, I was approached 15
years ago to represent certain people from Houston.Â  Retired.Â  Overseas.

Â Â Â Â Â Â Â Â Â  [Q]:Â  Okay.Â  So weÂre talking about big offenders?

Â Â Â Â Â Â Â Â Â  [A]:Â  I donÂt know.Â  It fell apart.

Â Â Â Â Â Â Â Â Â  [Q]:Â  Okay.

Â Â Â Â Â Â Â Â Â  .Â .Â .Â .

Â Â Â Â Â Â Â Â Â  [A:]Â  My wife and I were cruising Westheimer in
Houston, Texas, one night, and we saw an attempted drug deal that was going
down, and we had to flee to a lighted area and call the police.

Â Â Â Â Â Â Â Â Â  [Q]:Â  How do you know there was a drug deal going
down?

Â Â Â Â Â Â Â Â Â  [A]:Â  Well, I guess I surmised that when people who
appeared to be Latinos were backing into a street and had open cars and are
passing big white sacks.

Â Â Â Â Â Â Â Â Â  [Q]:Â  Ah.Â  Okay.

Â Â Â Â Â Â Â Â Â  [A]:Â  And then chase you down Westheimer.

Â Â Â Â Â Â Â Â Â  [Q]:Â  Oh, they were chasing you down Westheimer?

Â Â Â Â Â Â Â Â Â  [A]:Â  Yes, they were.

Â Â Â Â Â Â Â Â Â  .Â .Â .Â .

Â Â Â Â Â Â Â Â Â  [Q]:Â 
That sounds like a drug deal to me.

(2
R.R. at 43-44.)

Â 

Â Â Â Â Â Â Â Â Â  Rogers, lastly, testified to her
experiences with a child of a drug user:

Â 

Â Â Â Â Â Â Â Â Â  [Q]:Â  Miss Rogers?

Â Â Â Â Â Â Â Â Â  [A]:Â  Yes, sir.Â  IÂve had personal experience with
it in my family.Â  What happened, my adopted grandchild was born a crack baby,
and he was very thin and heÂs real limited, so I amÂitÂs bad. 

(2 R.R. at 45.)

Â Â Â Â Â Â Â Â Â  The last reason that the State gave
for striking Hall was that Hall was a Ârehabilitation jurorÂ and that the State
was Âgoing to proceed on a non-rehabilitation theory in th[e] case.ÂÂ  (2 R.R.
at 172.)Â  A panelistÂs Âview that rehabilitation is the goal of punishmentÂ can
be a race-neutral reason for striking the panelist.Â  See Adanandus, 866
S.W.2d at 225.

Â Â  The Texas
Penal Code states its purposes, including the purposes of punishment, as
follows, in part:

[T]he provisions of this code are intended, and shall
be construed, to achieve the following objectives:

Â Â Â Â Â  .Â .Â . to insure the public safety
through:

Â Â Â Â Â Â Â Â Â Â Â Â  (A)Â  the deterrent influence of the
penalties hereinafter provided;

Â Â Â Â Â Â Â Â Â Â Â Â  (B)Â  the rehabilitation of those
convicted of violations of this code; and

Â Â Â Â Â Â Â Â Â Â Â  (C)Â  such
punishment as may be necessary to prevent likely recurrence of criminal
behavior .Â .Â .Â .

Tex. Penal Code Ann. Â§Â 1.02 (Vernon 2003).

Â Â Â Â Â Â Â Â Â  Densey does not quote HallÂs testimony
in this regard.Â  (Cf. Densey Br. at 22-23.)Â  The prosecutor Greening
examined the panel as follows:

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [MR.
GREENING:]Â  ThereÂs four reasons
for punishment, and I just want to run these through you real quick,
and weÂll talk about these in the punishment phase of the trial, but when weÂwe
look at punishment, especially prosecutors, we look at protection of society,
number one.Â  We want to protect our people.Â  Retribution, rehabilitation and
deterrence.Â  Those are the fourÂfour of them.

If I can get a show of hands.

Â Â Â Â Â Â Â Â Â  Now, the protection of society,
retribution, which means the punishment shall fit the crime, rehabilitationÂwe
just want to fix the person.Â  Make them a better person.Â  I think IÂve already
asked you about that.

Â Â Â Â Â Â Â Â Â  Deterrence.Â  We want to deter other
people from making the same mistake.Â  Now, who thinks that deterrence is the
number one factor here at issue right now?

Â Â Â Â Â Â Â Â Â  [.Â .Â .Â .]

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  Deterrence.Â 
Who believes deterrence should be the No. 1 factor here?

Â Â Â Â Â Â Â Â Â  What about rehabilitation?Â  Fixing
people?

Â Â Â Â Â Â Â Â Â  [.Â .Â .Â .]

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  So nobody
raised their hand for deterrence.

What about rehabilitation?Â  Fixing people.Â  I
believe a man back here, Mr.Â

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. HUGHES:Â  Hughes.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  Hughes.Â  Does
anybody else agree with Mr. Hughes that fixing people is the most important
reason?

Â Â Â Â Â Â Â Â Â  Mr. Hall, do you agree with that?

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. HALL:Â  (Nods head.)

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  Fixing people
is the most important.Â  Do you agree with that, Miss Jones?

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MS. JONES:Â  (Nods head.)

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  [MR. GREENING:] Miss Caso,
you agree with that?

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MS. CASO:Â  Yes.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  And Mr. Moos,
you agree with that?

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. MOOS:Â  I think all four.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  That people
are important.Â  I tend to agree with that, too, Mr. Moos.

Â Â Â Â Â Â Â Â Â  IÂm sorry.Â  Miss .Â .Â .

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MS. ANGELE:Â  Angele.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  Angele.Â 
Okay.Â  You agree with that, also.

Â Â Â Â Â Â Â Â Â  Is that it?

Â Â Â Â Â Â Â Â Â  And Mr. Smith?

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. SMITH:Â  Yeah.Â  I simply
think that rehabilitation is an important part of that, if not the most.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  Okay.Â  Does
anybody else agree with that?

Â Â Â Â Â Â Â Â Â  The next one is retribution.Â  Now, I
know that some of these are very important.Â  All of them are important, but IÂm
just trying to get an idea of which is the most important to you as a person
when you think about punishment for a crime.

Â Â Â Â Â Â Â Â Â  So Âpunishment shall fit the crimeÂ is
retribution.Â  Who thinks that one?

Â Â Â Â Â Â Â Â Â  Mr. [.Â .Â .] Wilton?Â  Anybody else agree with Mr. Wilton?

Â Â Â Â Â Â Â Â Â  Protection of society.Â  Who thinks
thatÂs the number one?Â  Mr. Moos?

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. MOOS:Â  Upon retribution.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  ThatÂs
punishment shall fit the crime.Â  Do you agree with that?

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. MOOS:Â  Yes.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  Who else?

Â Â Â Â Â Â Â Â Â  And protection of society, protecting
the community.Â  Fifty-one, Mr. Watson.Â  Nineteen, 18, 32, 34Â

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  JUROR:Â  41.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. GREENING:Â  Â42, 43, 44,
28, 34, 26, and Mr. WatsonÂ

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. WATSON:Â  Yeah.Â  I just
want to say that all four are as important.Â  ThatÂs just for reference.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR.
GREENING:Â  Okay.Â  So, I gather that the rest of the people believe that all
four should be used together.

(2 R.R. at 79-83.)

Â Â Â Â Â Â Â Â Â  Densey introduced his examination of
the panel on the purposes of punishment in this way:

Â Â Â Â Â Â Â Â Â  Now, in Texas .Â .Â . I have
four reasons that we punish here in Texas, or we assess punishment.Â  One, the
first, is rehabilitation.Â  That is, to rehabilitate the offender, the person
that the jury has determined has broken the law.Â  Rehabilitation is one of the
reasons that we, in fact, punish, we assess punishment.

Â Â Â Â Â Â Â Â Â  Two is deterrence, okay?Â  Deterrence.Â 
To deter, either generally or specifically.

Â Â Â Â Â Â Â Â Â  To deter specifically is directed at
the offenders themselves, okay?Â  IÂm sending a message to the offender that
what he did was wrong.Â  And this punishment that weÂre assessing to you, be it
two years, five years, ten years in the penitentiary, is meant to deter you
from future wrongdoing.

Â Â Â Â Â Â Â Â Â  The second aspect of deterrence is
general deterrence.Â  ThatÂs a situation where, for example, if the punishment
appears in the newspaper, okay?Â  .Â .Â .Â .Â  The idea of general
deterrence is that if an offender reads about it or sees it in the media, that
there is a possibility that they will be deterred from future unlawful conduct,
engaging in that kind of conduct.

Â Â Â Â Â Â Â Â Â  The third reason that we punish as a
society is simply retribution.Â  And I callÂretribution is just straight out
punishment, and the idea that we are punishing for punishmentÂs sake.Â  The idea
again, kind of the eye-for-the-eye idea, that, you know, someone who is engaged
in this bad conduct just ought to be punished for no reason other than
punishmentÂs sake, okay?

Â Â Â Â Â Â Â Â Â  Now, what I would like to do is, IÂm
going to go down the rows, .Â .Â . and ask you to rate from the most
important to the least important, okay, of those three ideas, okay?

Â Â Â Â Â Â Â Â Â  First is rehabilitation.Â  Second is
deterrence, either specific or general, okay?Â  And third would be retribution,
punishment for punishmentÂs sake.Â  Those three.

Â Â Â Â Â Â Â Â Â  Retribution, 1.Â  Deterrence will be
2.Â  Retribution would be a 3, okay?

Â Â Â Â Â Â Â Â Â  What IÂd like for you to do is to tell
me what, [] yourÂorÂand 4.Â  I.Â  IÂll give you a Â4Â box of Âno opinion,Â okay?Â 
You have no opinion.Â  No opinion one way or the other, ÂI just donÂt care to
answer it.Â

Â Â Â Â Â Â Â Â Â  Okay.Â  What would be most important to
you?Â  One, two, three?Â  One, two, three.

Â Â Â Â Â Â Â Â Â  The first is
rehabilitation, in terms of goals of the criminal justice system.Â  Two would be
deterrence.Â  Three would be retribution, and four would be Âno opinion,Â okay?

(2
R.R. at 134-36.) 

Â 

Â Â Â Â Â Â Â Â Â  Densey argues:

Â 

In addition to Hall, the following panelists
articulated rehabilitation as the primary goal of the criminal justice system:
Panelist Jones; Panelist Ramirez; Panelist/juror Keys; Panelist/juror Conerway;
Panelist/Â­juror Pittman; Panelist Gibson; Panelist Arnold; Panelist/Â­juror
Angele; and Panelist Smith.Â  All but Panelist Jones prioritized punishment as
follows: first, rehabilitation; second, deterrence; third, retribution.Â 
Panelist Jones prioritized retribution over deterrence.Â  

Â Â Â Â Â Â Â Â Â  Panelist
Ramirez was challenged for cause, Panelist/jurors Keys, Conerway and Pittman
made the jury.Â  (RR, Vol. 2, pg. 180).Â  Panelists Gibson, Arnold and Smith were
struck by the State.Â  In all, three so called ÂrehabilitationÂ panelists were
not struck by the State and made the jury: Keys, Conerway and Pittman.Â  That
these non-minority jurors were not struck by the State despite giving identical
answers to the identical question regarding punishment priorities as
minority panelists Hall and Jones is an inconsistency never explained by the
State.

(Densey Br. at 22-23.)

Â Â Â Â Â Â Â Â Â  Conerway, first, is DenseyÂs weakest
case.Â  The prosecutor explained his reasons for striking her on the record.

Â Â Â Â Â Â Â Â Â  On examination by the State, Conerway
apparently did not answer the prosecutorÂs question, so the prosecutor took it
from ConerwayÂs silence that Conerway Âbelieve[d] that all four should be used
together.ÂÂ  (2 R.R. at 83.)Â  On examination by Densey, Conerway testified,
ÂOne, two, three,Â that is, that rehabilitation was most important, followed by
deterrence, followed by retribution.Â  (Id. at 140; see id. at
136.)

Â Â Â Â Â Â Â Â Â  Furthermore,
the prosecutor expressly argued his reasons for not striking Conerway:

Â 

[T]he reason why the
State did not strike Miss Conerway is because she gave good StateÂs answers,
her husband is in law enforcement, andÂand that is a consideration that we
thinkÂI mean, we did locate herÂor have her circled as aÂas a rehabilitational
juror, but I think the fact that her husbandÂs in law enforcement weighs in
favor, and to the Blinn officer who I know, soÂand I know how he is, so
.Â .Â .

(2 R.R. at 178.)[19]Â  Conerway testified on examination by Densey concerning
potential witnesses:

Â Â Â Â Â Â Â Â Â  [Q:]Â  And finally, Jimmy Jones with
the Bryan Police Department.Â  Does anybody know Officer Jones?

Â Â Â Â Â Â Â Â Â  .Â .Â .Â .

Â Â Â Â Â Â Â Â Â  And Miss Conerway?

Â Â Â Â Â Â Â Â Â  [A]:Â  My husband used to work with him
.Â .Â .Â .

Â Â Â Â Â Â Â Â Â  .Â .Â .Â .

Â Â Â Â Â Â Â Â Â  .Â .Â . IÂd see him
occasionally at the hospital.

Â Â Â Â Â Â Â Â Â  .Â .Â .Â .

Â Â Â Â Â Â Â Â Â  [Q]:Â  Anything about that that would
cause you difficulty?

Â Â Â Â Â Â Â Â Â  [A]:Â  No.Â  No problem.

Â Â Â Â Â Â Â Â Â  [Q]:Â  And I noted that youÂre aÂyour
husband is withÂis he with the police department?

Â Â Â Â Â Â Â Â Â  [A]:Â  Yes.Â  Blinn College.

Â Â Â Â Â Â Â Â Â  .Â .Â .Â .

Â Â Â Â Â Â Â Â Â  [Q]:Â  Okay.Â  .Â .Â .Â .Â 
Is that going toÂ

Â Â Â Â Â Â Â Â Â  [A]:Â  No.

Â Â Â Â Â Â Â Â Â  [Q]:Â  Your husband being a police
officer going to cause any difficulty for you?

Â Â Â Â Â Â Â Â Â  [A].Â  No.

(2 R.R. at 151-53.)[20]Â  

Â Â Â Â Â Â Â Â Â  ÂCertainly, there is no discriminatory
purpose inherent inÂ striking a panelist for having Âclose friends or relatives
in law enforcement.ÂÂ  Smith v. State, No. 14-96-00047-CR, 1999 Tex. App. LEXIS 2725, at *13, *12 (Tex. App.ÂHouston [14th Dist.] Apr. 8, 1999, no pet.)
(not designated for publication); accord Moton v. State, No.
14-97-00431-CR, 1999 Tex. App. LEXIS 2870, at *6-*7 (Tex. App.ÂHouston [14th
Dist.] Apr. 15, 1999, no pet.) (not designated for publication).[21]Â  Panelists who have Âfriends or relatives in
law enforcement .Â .Â . generally make good stateÂs jurors
.Â .Â .Â .ÂÂ  Whitsey, 796 S.W.2d at 714 (op. on orig.
submission).Â  

Â Â Â Â Â Â Â Â Â  Keys, next, on examination by the
State, apparently did not answer the prosecutorÂs question, so the prosecutor
took it from KeysÂs silence that Keys Âbelieve[d] that all four should be used
together.Â[22]Â 
(2 R.R. at 83.)Â  On examination by Densey, Keys testified:

[A]:Â Â Â  IÂd have to put deterrence and rehab as
number one, and thenÂ

[Q]:Â Â Â  Retribution, three?

[A]:Â Â Â  Âretribution.

(2 R.R. at 138.)

Â Â Â Â Â Â Â Â Â  Pittman, next, on examination by the
State, apparently did not answer the prosecutorÂs question, so the prosecutor
took it from PittmanÂs silence that Pittman Âbelieve[d] that all four should be
used together.ÂÂ  (2 R.R. at 83.)Â  On examination by Densey, Pittman testified,
ÂOne, two, three,Â that is, that rehabilitation was most important, followed by
deterrence, followed by retribution.Â  (Id. at 140; see id. at
136.) 

Â Â Â Â Â Â Â Â Â  The other panelist concerning whom
Densey complains is Jones.Â  The first reason the State gave for striking Jones
is that Jones Âknew crack, people that have smoked crack.ÂÂ  (2 R.R. at 173.)Â 
Densey points to the StateÂs voir-dire examination by the prosecutor as
follows:

Â Â Â Â Â Â Â Â Â  [Q:] Miss Jones, do youÂhave you ever
known anybody thatÂs done crack cocaine or seen anybodyÂ

Â Â Â Â Â Â Â Â Â  [A]:Â  Yes.

Â Â Â Â Â Â Â Â Â  [Q]:Â  And do you haveÂwhat are they
like?Â  What kind of people are they?

Â Â Â Â Â Â Â Â Â  [A]:Â  I donÂt know what to say.

Â Â Â Â Â Â Â Â Â  .Â .Â .Â .

Â Â Â Â Â Â Â Â Â  .Â .Â . A little bit selfish.Â 
Selfish people.

(2
R.R. at 38-39.)[23]

Â 

Â Â Â Â Â Â Â Â Â  Densey argues:

Â 

Panelist
Jones stated that she had known individuals who had done crack cocaine and they
were selfish people.Â  Panelist JonesÂ ÂStateÂs friendlyÂ answer to the StateÂs
inquiry was similar to the other non-minority panel members not struck by the
State who were asked specific questions of this type, specifically,
Panelist/jurors Weslowski, Bingham and Keys.

(Densey Br. at 24.)

Â Â Â Â Â Â Â Â Â  Weslowski, Bingham, and Keys are more
or less distinguishable.Â  They did not testify that they had close associates
who used crack.Â  Weslowski testified that he did not have any personal
experience with drug use or users.Â  (2 R.R. at 39-40.)Â  Bingham testified to
her experience with the child of a crack user.Â  (Id. at 40-42.)Â  Keys
testified that she knew schoolchildren who used drugs.Â  (Id. at 42.)

Â Â Â Â Â Â Â Â Â  The other reason that the State gave
for striking Jones is that Jones was a Ârehabilitation juror,Â and Âalso [wa]s
one of the only jurors .Â .Â . to put ÂdeterrenceÂ as the No. 3 reason
for punishment.ÂÂ  (2 R.R. at 173.)Â  Jones testified on voir-dire examination by
Densey on the purposes of punishment:

Â Â  [Q:]Â 
What about you, Miss Jones?

Â Â  [A]:Â 
Number one would be rehabilitation.

Â Â  [Q]:Â 
Okay.

Â Â  [A]:Â 
And two, retribution.

Â Â  [Q]:Â 
Two would be retribution?Â  So three would be deterrence?

Â Â  [A]:Â  Yes.

(2
R.R. at 136-37.)

Â 

Â Â Â Â Â Â Â Â Â  Densey argues:

Â 

As noted above,
despite prioritizing rehabilitation as the primary goal of punishment,
non-minority Panelist/jurors Keys and Pittman were not struck by the State.Â 
The State also argued that Panelist Jones was one of the only panelists who put
deterrence as the number three reason for punishment.Â  (RR, Vol. 2, pg. 172,
ln. 23-24).Â  Panelist Jones articulated retribution as her second priority,
ahead of deterrence, in her ranking of priorities for punishment.Â  (RR, Vol. 2,
pg. 137, lns. 1-6).Â  If the StateÂs punishment theory was non-rehabilitation,
as they articulated to the Trial Court, Panelist JonesÂ answer would be more
consistent with the StateÂs theory, not less.

(Densey Br. at 24-25.)

Â Â Â Â Â Â Â Â Â  Prosecutors commonly believe that
jurors who favor retribution are the most pro-State, and those who favor
rehabilitation are the least pro-State.Â  Those who favor deterrence are
believed to be between those who favor retribution and those who favor
rehabilitation.Â  

Â Â Â Â Â Â Â Â Â  Viewing the record in the light most
favorable to the trial courtÂs finding of no deprivation of equal protection, I
cannot say that the trial court clearly erred.Â  I now turn to DenseyÂs second
group of arguments.

Â Â Â Â Â Â Â Â Â  Next, DenseyÂs motion for rehearing
makes several arguments predicated on a distinction between the instant case
and the Court of Criminal AppealsÂ opinion in Gibson v. Texas.Â  See Gibson, 144
S.W.3d 530.

Â Â Â Â Â Â Â Â Â  Under this heading, Densey first argues, without regard to Gibson,
that this Court mischaracterized his argument:

Â Â  The Memorandum Opinion in this case
characterized AppellantÂs arguments as it relates to the pretextual striking by
the State of panelist number two, Audrey Jones, as Â[the] State did not strike
other panelists who had a poor opinion of crack users.ÂÂ  Slip Opinion
at pg. 2-3.

Â Â  This
was not AppellantÂs argument.Â  Instead, Appellant argued that it Âblinked
reality,Â much as it did in Miller-El, that the State would
strike a juror who had a poor opinion of crack users in a trial where the
defendant was on trial for Possession with Intent to Deliver Cocaine, unless
race did, in fact, play a factor.

([sic] Mot. RehÂg at 3-4 (alteration in Mot.
RehÂg)); see Miller-El, 125 S.Â Ct. at 2340.Â  

Â Â Â Â Â Â Â Â Â  In this regard, Densey misrepresents
the record.Â  Densey did not make a Âblinks-realityÂ argument in either his
original brief or his supplemental brief.Â  (Cf. Densey Br.; Supp. Br.)

Â Â Â Â Â Â Â Â Â  Next, again without
regard to Gibson, Densey argues under this heading:

Â Â  The
Memorandum Opinion also does not address AppellantÂs arguments contained in his
Supplemental Memorandum that questions pertaining to experiences with crack
cocaine stopped after panelist number 11.Â  The two minority jurors for which Batson
challenges were made were panelist numbers 1 and 2.Â  Miller-El
pointed to disparate examination of the venire as a basis for the holding in
that case.Â  Miller-El at 2333.

Â (Mot.
RehÂg at 4 (citing Miller-El, 125 S.Â Ct. at 2333).)

Â 

Â Â Â Â Â Â Â Â Â  In
DenseyÂs Supplemental Memorandum, he argued: 

Â 

.Â .Â .
African-American panelist Hall was panelist number one and African-American
panelist Jones was sitting next to him as panelist number two.Â  The common race
neutral reason given by the State for striking panelists Jones and Hall were
their answers to questions pertaining to experience with crack cocaine.Â  As
developed in AppellantÂs Brief, the State stopped asking individual jurors
questions pertaining to experiences with crack cocaine after juror number
eleven.Â  This demonstrates, Appellant submits, disparate questioning.

(Supp. Memo. at 4-5.)

Â Â Â Â Â Â Â Â Â  It is often said that Âthe State is
not required to ask a specified rubric of questionsÂ on voir dire examination.Â 
See Chambers v. State, 866 S.W.2d 9, 24 (Tex. Crim. App. 1993).Â  

Â Â Â Â Â Â Â Â Â  The record does not clearly support
DenseyÂs argument.Â  The record does not even contain a jury list.Â  (Cf.
C.R.)Â  Near the conclusion of the prosecutorÂs line of questioning on that
issue, the prosecutor said:

I donÂtÂI could go through everybody.Â  I mean,
you guys are greatÂpeople.Â  YouÂve been very talkative and helpful and have
helped me a lot, but is there anybody else on the front row thatÂs had an
experience that maybe they want to share?Â  Volunteer?Â  Remember, the more you
talk, the less likely youÂre going to end up on the jury.Â  (Panel laughter.)Â 
SomebodyÂs going to think something bad about you, you know.Â  So youÂve got to
talk to me.Â  ThatÂll get you to volunteer.

Does anybody have any other experiences?

(2 R.R. at 46.)Â  No panelists responded.Â  (Id.)Â  After this, the prosecutor individually questioned two more panelists.Â  (Id. at 46-47.)

Â Â Â Â Â Â Â Â Â  In order to implicate equal
protection, Âdisparate questioningÂ must be disparate with regard to race or to
a protected class.Â  See Miller-El v. Cockrell, 537 U.S. at 332.Â  ÂDisparate examinationÂ signifies Âquestioning a challenged juror so as to
evoke a certain response without asking the same question of other panel
members.ÂÂ  Whitsey, 796 S.W.2d at 714 (op. on orig. submission).Â 
Assuming that DenseyÂs statement of the facts is accurate, that the State
individually questioned the two African-Americans among the first eleven
panelists, but did not individually question the other two African-Americans or
forty or more non-African-Americans on the panel, does not constitute disparate
questioning for equal-protection purposes.

Â Â Â Â Â Â Â Â Â  Lastly, under this heading, Densey
argues, ÂThe Gibson evidentiary record also disclosed credibility
decisions the trial judge was required to make not present in this case.ÂÂ 
(Mot. RehÂg at 4.)Â  The trial court did necessarily make credibility
determinations.

Â Â Â Â Â Â Â Â Â  This CourtÂs Memorandum Opinion cites Gibson
v. Texas for the proposition that the standard of review for Batson
challenges is Âclear error.ÂÂ  See Densey, slip op. at 3, 2005
Tex. App. LEXIS 5239, at *3; Gibson, 144 S.W.3d at 533-34.Â  Densey
attempts to distinguish Gibson in this way:

As observed in Gibson veniremember
number 7 in that case qualified his answer on the comparative analysis issue,
the so called Âone witness ruleÂ when questioned by the defense.Â  Gibson
at 534.Â  Unlike the minority juror he was being comparatively analyzed with,
veniremember 7 gave assurances on questioning by the defense that he could
follow the Âone witness rule.Â

Â Â Â Â Â Â Â Â Â  Venireman
7 in Gibson justified the StateÂs decision not to strike him by
additionally saying that the defendant should testify and Âexplain his part.ÂÂ 
This is in contrast to this case, in which the minority juror, Audrey Jones,
was struck by the State after giving a State friendly answer to a
question it later used as its purported Ârace neutralÂ reason for striking
her.Â  These significant factual differences between Gibson and
this case indicate the need for credibility decision present in Gibson
that did not exist in the trial court below.

[sic] (Mot. RehÂg at 4-5 (citing Gibson, 144
S.W.3d at 534)); see Palmer v. State, 92 Tex. Crim. 470, 471, 244 S.W.
513, 513 (1922) (stating Âone-witness ruleÂ).[24]

Â Â Â Â Â Â Â Â Â  To the contrary, as the Supreme Court
and the Court of Criminal Appeals have recognized, credibility evaluations are
essential to the Batson analysis.Â  Miller-El did not change this.[25]Â  It has been said that in Âa ruling on a Batson
claim, .Â .Â . the trial courtÂs ruling will almost always turn exclusively
on its evaluation of credibility and demeanor.ÂÂ  Guzman v. State, 955
S.W.2d 85, 95 (Tex. Crim. App. 1997) (Meyers, J., concurring & dissenting)
(emphasis in orig.).Â  

Â Â Â Â Â Â Â Â Â  The Gibson Court expressly
held: ÂThe Court of Appeals .Â .Â . misapplied th[e] Âclearly
erroneousÂ standard of appellate review when it substituted its judgment for
the trial courtÂs in deciding that the prosecutorÂs facially race-neutral
explanation for striking [a] veniremember .Â .Â . was a pretext.ÂÂ  Gibson,
144 S.W.3d at 534.Â  The Supreme Court has held that Â[a] state courtÂs
finding of the absence of discriminatory intent is Âa pure issue of factÂ
accorded significant deference.ÂÂ  Miller-El v. Cockrell, 537 U.S. at 339 (quoting Hernandez, 500 U.S. at 365).Â  ÂDeference to trial court findings on the
issue of discriminatory intent makes particular sense in this context because
.Â .Â . the finding Âlargely will turn on evaluation of credibility.ÂÂÂ 
 Id. (quoting Batson, 476 U.S. at 98 n.21).

In
the typical peremptory challenge inquiry, the decisive question will be whether
counselÂs race-neutral explanation for a peremptory challenge should be
believed.Â  There will seldom be much evidence bearing on that issue, and the
best evidence will often be the demeanor of the attorney who exercises the
challenge.Â  As with the state of mind of a juror, evaluation of the
prosecutorÂs state of mind based on demeanor and credibility lies Âpeculiarly
within a trial judgeÂs province.ÂÂ  

Id.
(quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)).Â  ÂDeference is
necessary because a reviewing court, which analyzes only the transcripts from voir
dire, is not as well positioned as the trial court is to make credibility
determinations.ÂÂ  Miller-El v. Cockrell at 339.Â  In the analysis of
whether the reason for a strike is pretextual, Â[t]he term ÂpretextÂ is solely
a question of fact; there is no issue of law.ÂÂ  Gibson, 144 S.W.3d at
533.Â  ÂFactual disputes almost always turn on witness credibility.ÂÂ  Hanks
v. State, 137 S.W.3d 668, 671 (Tex. Crim. App. 2004).Â Â  

Â Â Â Â Â Â Â Â Â  Finding neither of DenseyÂs arguments
persuasive, I would overrule his sole ground for rehearing and overrule his
Motion for Rehearing.

Postlude

Â Â Â Â Â Â Â Â Â  Maybe the reader will enjoy the irony
of Justice VanceÂs refusal to join this opinion as much as I did.Â  He would not
join the CourtÂs opinion which decided the case because he thought it was
Âperfunctory.ÂÂ  Densey, 2005 Tex. App. LEXIS 5239, at *7 (Vance, J.,
concurring note).Â  But he wrote nothing to Âassist the litigants, the higher
courts, the Bench and Bar, or the public.ÂÂ  Id. 

Â Â Â Â Â Â Â Â Â  The motion for rehearing is based
entirely on Miller-El, which issued shortly before the opinion on
original submission in this case.Â  Due to the manner in which the issue was
briefed on rehearing, I realized that we were not going to get an adequate Miller-El
analysis in the briefs submitted to this Court unless we explained how Miller-El
was going to affect defendants making Batson claims.Â  I therefore
decided that it would be worthwhile to prepare and explain the type of analysis
that will be necessary for the brief of a defendant to present a viable Batson
claim.Â  And while Miller-El did not change the standard of review, it
did change what we review and how it should be presented, first to the trial
court, and then to the appellate court.Â  This analysis took a lot of time and
is extremely record-intensive. 

Â Â Â Â Â Â Â Â Â  Now that I have prepared the more
expansive analysis on this issue, Justice Vance throws a few rocks at the
analysis without any real specificity, confuses the distinction between the
analysis necessary in a brief with what is an appropriate disposition of the
issue in an opinion, and simply concurs in the one-line opinion overruling the
motion for rehearing that contains no explanation.Â  He still has not written
what he thinks is an appropriate disposition of this issue.Â  He apparently
believes that eleven lines are not enough.Â  But if we get the type of briefs
that we should, eleven lines in an opinion may very well be excessive. 

Â Â Â Â Â Â Â Â Â  Maybe now court-watchers will understand
why I believe that the best practice, consistent with the rules, is preparing a
short, focused memorandum opinion.Â  See Tex. R. App. P. 47.1.Â  Brevity and focus also help limit the
areas in which there can be disagreement, and we could use a lot less of that. 

TOM GRAY

Chief
Justice

Concurring
opinion delivered and filed March 22, 2006

Publish

[CRPM]

Â 









[1]Â  Citations
and references to ÂMiller-El,Â without further qualification, refer to Miller-El
v. Dretke.Â  See Miller-El v. Dretke, 545 U.S. ___, 125 S.Â Ct. 2317
(2005).Â  I also cite the Supreme CourtÂs earlier case concerning Miller-El, Miller-El
v. Cockrell, as ÂMiller-El v. Cockrell.ÂÂ  See Miller-El v.
Cockrell, 537 U.S. 322 (2003).





[2]Â  See
also People v. Coulter, 799 N.E.2d 708, 711-712 (Ill. App. Ct. 2003), cert.
denied, 125 S. Ct. 2928 (2005); but see Commonwealth v. Morris, 822
A.2d 684, 701 (Pa. 2003) (Castille, J., concurring) (Miller-El v. Cockrell
Âdemonstrates just how changeable and unpredictable the federal appeal standard
isÂ).





[3]Â  See
also, e.g., Peetz v. State, 180 S.W.3d 755, 760 n.2 (Tex. App.ÂHouston
[14th Dist.] 2005, no pet.); Villegas v. State, No. 03-04-00689-CR, 2005
Tex. App. LEXIS 8737, at *19 (Tex. App.ÂAustin Oct. 20, 2005, no pet.) (not
designated for publication) (mem. op.); Stewart v. State, No.
01-04-01041-CR, 2005 Tex. App. LEXIS 7953, at *6 (Tex. App.ÂHouston [1st Dist.]
Sept. 29, 2005, no pet.).





[4]Â  See
also, e.g., Majid v. Portuondo, 428 F.3d 112, 131 (2d Cir. 2005); Guidry
v. Dretke, 429 F.3d 154, 160-61 (5th Cir. 2005) (denial of rehÂg en banc)
(per curiam).Â  





[5]Â  The
Fifth Circuit concludes sharply:

We recognize that Miller-El [v.
Dretke] may be the first ring of the death knell for peremptory
challenges, [Miller-El v. Dretke, 125 S.Â Ct.] at 2342-44 (Breyer,
J., concurring), and that the Supreme Court may well grant certiorari in
this case to finally bury the concept of peremptory challenges.Â  We see nothing
in Miller-El [v. Dretke], however, that compels us to
reach that conclusion here in Murphy and leave it to the Supreme Court to
say whether Miller-El [v. Dretke] will extend that far.

Murphy,
416 F.3d at 439.





[6]Â  In
his concurrence, Justice Breyer describes that explanation as the ÂprosecutorÂs
instinctive judgmentÂthe underlying basis for which may be invisible even to
the prosecutor exercising the challenge.ÂÂ  Miller-El, 125 S.Â Ct. at 2341 (Breyer, J., concurring).Â  





[7]Â  In
his concurrence, Justice Breyer calls the trial courtÂs Âtask of
second-guessingÂ the prosecutorÂs judgment ÂawkwardÂ and Âsometime hopeless.ÂÂ  Miller-El,
125 S.Â Ct. at 2341 (Breyer, J., concurring).Â  Thus, quoting Justice
Thurgood Marshall, Breyer concludes,Â  Âthe only way to Âend the racial
discrimination that peremptories inject into the jury-selection systemÂ
.Â .Â . [i]s to Âeliminat[e] peremptory challenges entirely.ÂÂÂ  Id. at 2340 (quoting Batson, 476 U.S. at 102-103 (Marshall, J.,
concurring)) (last alteration in Miller-El (Breyer, J., concurring)).





[8]Â  Justice
Souter uses ÂblinkÂ in the sense of Âclose oneÂs eyes to.ÂÂ  See WebsterÂs Third International Dictionary of
the English Language Unabridged 234 (Philip Babcock Gove ed. 1993)
(Âdeny recognition to,Â Âdeliberately evadeÂ, or ÂignoreÂ; e.g., as used
Âof a sporting dog,Â Âto refuse to see and point (game)Â).Â  





[9]Â  The
appendix constitutes the extracts from the record filed in the U.S. Supreme
Court.Â  Sup. Ct. R. 26.1; see App.,
Miller-El, 125 S.Â Ct. 2317 (No. 03-9659), 2004 WL 2899955 (pp.
i-iv, 1-486), 2004 WL 2891870 (pp. 487-1052).





[10] Of
course, there is no requirement of or even a procedure for giving a reason for
a jury shuffle.Â  See Tex. Code
Crim. Proc. Ann. art. 35.11 (Vernon Supp. 2005) (Âon demandÂ).Â  The
Texas Court of Criminal Appeals has held that Batson does not apply to
shuffles.Â  Ladd v. State, 3 S.W.3d 547 (Tex. Crim. App. 1999); but
see Alan L. Levy, Petit Jury Selection and Composition, in State Bar of Tex. Prof. Dev. Program, Advanced
Criminal Law Course 15, at 15-39 (2005) (ÂThere is a strong probability
that Batson will be extended to jury shuffles.Â) (citing Miller-El).





[11] See
Act of May 28, 1979, 63d Leg., R.S., ch. 426, art. 3, Â§Â 1, sec.
(b)(2), 1973 Tex. Gen. Laws 1122, 1125 (amended 1991) (current version at Tex. Code Crim. Proc. Ann. art. 37.071,
Â§Â 2(b)(2) (Vernon Supp. 2005)) (special issues in capital murder
punishment trial).





[12] See
Tex. Penal Code Ann.
Â§Â§Â 12.32(a), 19.02(c) (Vernon 2003) (punishment range).





[13]
Justice Souter says, Âwe know,Â even ÂÂ[]though most of the witnesses
[presented at the Swain hearing in 1986] denied the systematic policy to
exclude African-AmericansÂ .Â .Â .Â .ÂÂ Â Miller-El, 125
S.Â Ct. at 2338 (quoting Miller-El v. Cockrell, 537 U.S. at 334-35) (second alteration in Miller-El v. Cockrell); see Swain, 380 U.S. 202.Â  The Supreme Court notes, however, Âothers disagreed,Â citing the testimony of
two witnesses.Â  Miller-El at 2338.Â  The only evidence that Court cites
that prosecutors in Miller-ElÂs trial were following the policy manual is that
they recorded the race of the juror on the juror information card, as the
manual instructed.Â  Id. at 2339, 2340.Â  As Justice Thomas notes in his
dissent: ÂThe majority .Â .Â . tars prosecutors with a manual entitled
Jury Selection in a Criminal Case (hereinafter Manual or Sparling Manual),
authored by John Sparling, a former Dallas County prosecutor.Â  There is no
evidence, however, thatÂ the trial prosecutors Âhad ever read the ManualÂwhich
was written in 1968, almost two decades before Miller-ElÂs trial.ÂÂ  Miller-El,
125 S.Â Ct. at 2362 (Thomas, J., dissenting).Â  ÂThe reason there is no
evidence on the question is that Miller-El never asked.Â  During the entire
Batson hearing, there is no mention of the Sparling
Manual.Â .Â .Â .Â  The majority simply assumes that all Dallas County prosecutors were racist and remained that way through the mid-1980Âs.ÂÂ  Id.





[14] Some
commentators have said that Miller-El Âput teeth in BatsonÂ in
this regard.Â  Perry A. Craft & Michael G. Sheppard, Supreme Court
Review: What the U.S. Supreme CourtÂs 2004-2005 Decisions Mean to Tennessee Lawyers, 41 Tenn. B.J. 16, 34
(2005) (Â[T]he court refused to defer to a prosecutorÂs post hoc justifications
for striking Blacks from juries .Â .Â .Â .Â).





[15] See
also, e.g., Middleton v. State, No. 06-05-00081-CR, 2006 Tex. App. LEXIS
578, at *17 (Tex. App.ÂTexarkana Jan. 25, 2006, no pet.).





[16] In
DenseyÂs original brief, he argued that the State struck 67% or two of the
three blacks in the strike zone.Â  (Densey Br. at 18, 19.)Â  In DenseyÂs
Supplemental Memorandum, he argued, Â75% of the African-American representation
in AppellantÂs case were struck by the State.ÂÂ  (Supp. Memo. at 4.)Â  Especially
when dealing with such a small sample (three in the strike zone or four on the
whole panel), the difference is not significant.Â  See Levy, Petit
Jury Selection and Composition, in State
Bar of Tex. Prof. Dev. Program, Advanced
Criminal Law Course 15, at 15-43 through 15-44 (2005).





[17] The
examination continues as follows:

[Q]:Â  No?Â  Okay.Â 
So you probably didnÂt spend a lot of time with them.Â  Is that a true
statement?

[A]:Â  IÂve seen
them.

[Q]:Â  Okay.Â  And
do you think the police and the legal system are doing a good job policing
crack cocaine?

[A]:Â  Yes.

[Q]:Â  Have you
ever known any dealers?

[A]:Â  Yeah.

[Q]:Â  Yeah.Â  And
did you ever spend any time with them, get to know them, anything like that?

[A]:Â  No.

(2 R.R. at 38.)





[18] Other
panelists, not noted by Densey, testified similarly:

Â·Â Â Â Â Â Â Â 
Ramirez:Â  Â.Â .Â . I donÂt have any experiences.Â 
.Â .Â .Â .Â  I guess it starts with the young people and they follow
up and it goes up to other things.Â  It affects peopleÂs habit of wanting to go
after something they donÂt need to do.Â  TheyÂll be working and trying to get
something for nothing, where they can make some big bucks.ÂÂ  (2 R.R. at 39.)

Â·Â Â Â Â Â Â Â 
Wilton:Â  ÂI donÂt have any firsthand knowledge, but from what I
have experienced or heard about is the totally negative influence.Â  IÂve had
knowledge of aÂsecond-hand, by word of mouth of a crack house in the area, and
IÂve seen what a bad influence thatÂs been.Â  As far as the police force doing a
good job in that area, itÂs still around.Â  The crack house is still there, as
far as I know, so IÂm not sure that theyÂre doing their job in the force.ÂÂ  (Id. at 44-45.)

Â·Â Â Â Â Â Â Â 
OÂShea:Â  Â.Â .Â . I used to live in Baltimore, so IÂve
seen whatÂthe effects of crack on a big city.Â  There are places in Baltimore that look like a war zone.ÂÂ  (Id. at 46-47.)





[19] Contrary
to the StateÂs argument, I do not identify any distinctly Âgood StateÂs answersÂ
in ConerwayÂs testimony.Â  (Cf. 2 R.R. at 178.)Â  Besides the above, and
besides ConerwayÂs testimony on her knowing DenseyÂs sister and on the purposes
of punishment, (id. at 48, 140), ConerwayÂs testimony was that: 

Â·Â Â Â Â 
she had no ÂproblemÂ with the
presumption of innocence, (id. at 109);

Â·Â Â Â Â 
the burden of proof was fair to
the State, (id. at 116), and she would hold the State to the burden of
proof, (id. at 124); and 

Â·Â Â Â Â 
she had no ÂdifficultyÂ with the
defendantÂs not testifying, (id. at 130).





[20] Officer
Jones did not testify.Â  (Cf. R.R.)





[21] See
also Guzman, 85 S.W.3d at 250 n.28 (prosecutor struck panelist because she
had Âno connection with law enforcement .Â .Â . as a friend of those in
law enforcementÂ); cf. Godine v. State, 874 S.W.2d 197, 202 (Tex.
App.ÂHouston [14th Dist.] 1994, no pet.) (panelists asked about Âtheir law
enforcement relatives, friends, and acquaintancesÂ).Â  





[22] On
examination by the prosecutor in this line of questioning, the following
exchange occurred:

Â Â Â Â  [MR. GREENING:]Â  IÂm just
trying to get an idea of which is the most important to you as a person when
you think about punishment for a crime.

.Â .Â .Â .

And protection of society,
protecting the community.Â  Fifty-one, Mr. Watson.Â  Nineteen, 18, 32, 34Â

Â Â Â Â  JUROR:Â  41.Â Â Â Â Â  

Â Â Â Â  MR. GREENING: Â42, 43, 44, 28, 34, 26, and Mr.
WatsonÂ

(2 R.R.
at 82.)Â  The record does not clearly show what panelists correspond to these
numbers.Â  (Cf. C.R.; R.R.)





[23] The
examination of Jones continued as follows:

Â Â  [Q]:Â Â  TheyÂre
thinking about getting more crack, right?

Â Â  [A]:Â Â  Yes.

(2 R.R.
at 39.)





[24] See
also Lee v. State, 176 S.W.3d 452, 458 (Tex. App.ÂHouston [1st Dist.] 2004,
pet. granted); Garrett v. State, 815 S.W.2d 333, 335 (Tex. App.ÂHouston [1st
Dist.] 1991, pet. refÂd).





[25] In
Miller-El, the Supreme Court notes that under the procedural history of
that case, Âthe state trial court had no occasion to judge the credibility ofÂ
the StateÂs Âexplanations at th[e] time becauseÂ the Supreme CourtÂs Âequal
protection jurisprudence then, dictated by Swain, did not require it.ÂÂ  Miller-El,
125 S.Â Ct. at 2325 (quoting Miller-El v. Cockrell, 537 U.S. at 343) (citing Swain, 380 U.S. at 223-24); see also id. at 2329 (Â[T]he
credibility of reasons given can be measured by Âhow reasonable, or how
improbable, the explanations are; and by whether the proffered rationale has
some basis in accepted trial strategy.ÂÂ (quoting Miller-El v. Cockrell
at 339)).